# EXHIBIT B

{00291191.DOC;}

#2007-22
Interstate Hotels & Resorts, Inc. &
Best Western
April 10, 2007
Page 1 of 11

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

**EMPLOYER:  INTERSTATE HOTELS & RESORTS, INC./BEST WESTERN**

HTC Case #U06-109/Emergency Hearing requested by the New York Hotel & Motel Trades Council, AFL-CIO, re: Employer's failure and refusal to recognize and be bound by Article 60 of the Industry Wide Agreement.

Hearing held at the Office of the Impartial Chairperson on March 1, 2007.

## APPEARANCES:

For the Owner:                    Joy Johnson

For the Employer: Interstate:
Counsel:                          Seyfarth Shaw, LLP
        By:                       Peter A. Walker, Esq.

For the New York Hotel & Motel Trades Council, AFL-CIO:
Counsel:                          Pitta & Dreier LLP
        By:                       Barry Saltzman, Esq.

For the Union:                    Rich Maroko, Esq.

* * *

This is the third case addressing the applicability of a Memorandum of Agreement between the Union and Interstate Hotels and Resorts, Inc. ("Interstate") dated January 15, 2004 ("MOA"), often referred to simply as the neutrality agreement which, among other things, expressly applies certain of its provisions to "any hotel... in the New York city area which came or comes to be owned, operated or managed by Interstate since July 1 2001."  The MOA was introduced into the record as Union Exhibit #2.  It is undisputed that the MOA excludes the application of its terms to Marriott JFK on North Conduit Avenue, Jamaica, New York.

In the belief that Interstate had come to own, operate or manage the Best Western Hotel located at 522 West 38th Street, New York City ("Best Western"), the Union sent a notice, dated February 2, 2007, of its intent to organize Best Western's employees and demanding that Best Western furnish the Union with certain data as enumerated therein relevant to such activities (Union Exhibit #3). The Union introduced into the record a copy of the Management Agreement

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

between Unigroup Hotel LLC ("Unigroup" or "Owner"), the undisputed owner of the subject hotel and Crossroads Hospitality Management Company ("Crossroads") (Union Exhibit #1).  Interstate stipulated that Crossroads is an affiliated company of Interstate and may be deemed Interstate for purposes of the issues at bar.  It further conceded that it is the employer of all the employees at the Best Western Hotel.

Attached to the Management Agreement is a Letter Agreement, dated June 1, 2001 ("LA 2001").[1]  The LA2001 references the Management Agreement between Unigroup Hotel, LLC (Best Western Hotel) and Interstate and specifies therein the activities which Interstate will perform on behalf of Owner.  Six pre-opening activities are noted with the caveat that they are without limitation.

At the hearing, Union attorney Barry N. Saltzman referenced a February 23, 2007 letter he submitted to this tribunal, pursuant to the direction of Impartial Chairperson Ira Drogin made on February 7, 2007, constituting a position letter in support of the Union's thesis that both Interstate, as Manager of Best Western, and Unigroup, as owner of the Hotel, are jointly and severally bound to the card count/neutrality provisions set forth in the MOA and in the 2006 IWA.[2]  Attorney Saltzman's letter notes that Chairperson Drogin had decided two cases involving Interstate (#2007-08 and #2007-10) which held that the owners of the two hotels in question were bound through Interstate to the neutrality provisions of both the MOA and IWA.  That position letter was presented to the undersigned.  At the hearing, it was agreed that Interstate would be permitted to submit a post-hearing letter brief in further support of its position that the Best Western Hotel is excluded from the MOA.  On March 12, 2007, Interstate's attorney, Peter A. Walker, submitted his brief.  It was further agreed that the Union would have the opportunity to submit a reply brief.  On March 19, 2007, Attorney Saltzman submitted his reply.

It was stipulated that although the Management Agreement states that Interstate would assume management and operation of the Hotel when it "opens for business, which is expected to be on or about October 1, 2001", the Hotel actually opened in February or March 2002.

---

[1]  This document and the MOA were introduced into the record, as a single document, by Interstate as Employer Exhibit 1. The Union pointed out that a representative of Interstate had forwarded, via e-mail, to the Union's attorney, a copy of the Management Agreement which did not include a copy of LA 2001. For purposes of this case and the positions taken by Interstate regarding its obligations under the MOA, the Union accepted the authenticity of LA 2001.
[2] Because Chairperson Drogin believed that he would likely not be available to hear the instant dispute, he advised the parties that the matter could be submitted to any Chairperson sitting that day.

#2007-22
Interstate Hotels & Resorts, Inc. &
Best Western
April 10, 2007
Page 3 of 11

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

The parties' positions, drawn, nearly *verbatim*, from the argument sections of their briefs, are set out below in different font style and size to differentiate their words from the Arbitrator's[3]:

## Union's Contentions

### Interstate and Owner Are Bound by the MOA at the Hotel

Under the terms of the MOA, Par. 1, the IWA's card count/neutrality provisions apply to "any hotel … in the New York city area which came or comes to be owned, operated or managed by Interstate since July 1 2001." The Management Agreement expressly provides in Section 2.2 that:

> "Manager shall assume management and operation of the Hotel upon the date the Hotel opens for business, which is expected to be on or about October 1, 2001 (the "Management Commencement Date"). (emphasis added)

In fact, an internet website posted by Best Western dated March 12, 2002 states that the Hotel "management will be hosting a grand opening event on March 15." Since Interstate commenced "management and operation of the Hotel no earlier than October 2001", the MOA clearly applies to this Hotel by its express terms.

Further proof that the MOA applies to the Hotel arises from the last sentence of Par. 1 where Interstate and the Union expressly excluded the Courtyard by Marriott JFK from the card count/neutrality obligation. Under basic principles of contract construction, the expression of one exception excludes unlisted exceptions. Thus, by excluding the Courtyard JFK but not the Best Western, the parties clearly left the Hotel within the coverage of the MOA.

### Interstate and Owner Are Bound by Article 60 and Addendum IV of the 2006 IWA at the Hotel

Under the Management Agreement, Interstate clearly operated and managed the Hotel for Owner as of the date of the MOA (January 15, 2004). Par. 2 of the MOA provides that Interstate "agrees to adopt, assume and be bound" by the 2006 IWA which succeeded the 2001 IWA "on its own behalf and on behalf of any hotel or concessionaire which it currently or hereinafter owns, operates or manages …" (Emphasis added). The 2007 IWA contains its own card-count/neutrality provisions in Addendum IV thereof, which substantially mirror the terms of the MOA. Accordingly, Interstate bound Owner and the Hotel to the 2006 IWA card-count/neutrality provisions by virtue of Par. 2 of the MOA as well as Par. 1.

### Owner Cannot Escape Its Obligations by Obfuscation and Artifice

Prior OIC Awards against Interstate concerning the Chelsea Four Points by Sheraton (Award No. 2007-08) and Wingate Inn (Award No. 2007-10)(jointly the "Interstate Awards") established the precedent that a hotel owner who allows its manager to act as its agent or joint employer will be bound to the managers card-count/neutrality provisions.

In this case, the Management Agreement establishes that Owner allowed Interstate to act both as its agent and as joint employer, thereby binding Owner to

---

[3] To avoid confusion, the footnotes in the parties' briefs appear in parentheses and in boldfaced type, at the point where the note symbol appears in their text.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

the MOA and 2006 IWA card-count/neutrality provisions. Thus, without limitation, under Section 2.03 of the Management Agreement, "Owner's and Manager's agents and employee ... shall   be acting as the agent of Owner" *(Emphasis added)*. Similarly, Owner and Interstate act as joint employers under labor law principles as evidenced in the second "Whereas" preface on page 1 of the Management Agreement: "Owner desires to have Manager assist Owner in managing and operating the hotel ..."; and Section 3.1(D) and 3.2 thereof (Owner must consent to service contracts exceeding one year and any collective bargaining agreement). Accordingly, applying the Interstate Awards, Owner cannot escape honoring its card-count/neutrality obligations. (The MOA and Article 60/Addendum IV of the 2007 IWA do not require Owner's "express written approval" under Management Agreement Sec. 3.2 because card-count/neutrality agreements by their nature cannot be collective bargaining agreements. Rather they are contracts which require no Owner approval or, at most, such approval which "shall not be unreasonably withheld or delayed.")

[From the Reply Brief]

In its February 23, 2007 letter (**The terms used herein are defined in the Union's letter dated February 23, 2007, incorporated herein by reference.**), the Union showed that the card-count neutrality provisions of its MOA with Interstate applies to the Hotel because "management and operation of the Hotel" commenced under the express terms of the Management Agreement well after the MOA's effective date. In response, Interstate attempts to read the plain words of the MAO and its Management Agreement opposite to their simple meaning and contrary to logic. For the reasons set forth below and in the Union's prior letter, Interstate's arguments should be rejected. Both Interstate and Owner should be ordered to apply the MOA card-count neutrality provisions of the MOA and IWA incorporated therein to the Hotel on the same terms as prescribed by Chairperson Drogin in Award No. 2007-08 and No. 2007-10 (the "Interstate Awards")

<u>Tails Do Not Wag Dogs</u>

The heart of Interstate's argument posits that the 3-page "Pre-Opening Agreement" attached as an appendix to the Management Agreement between Interstate and Owner Unigroup Hotel LLC overrides the express terms of the Management Agreement. This argument turns the documents on their heads.

First, Interstate's argument distorts the plain meaning of the words "operated or managed" used both in the MOA between Interstate and the Union and in the Management Agreement. One cannot operate or manage a hotel before it opens because there is no hotel to operate or manage. The Management Agreement acknowledges this simple truth by its express definition that Interstate "shall assume management and operation of the Hotel upon the date the Hotel opens for business... (the Management Commencement Date") (Management Agreement § 2.2, emphasis added). Thus, Interstate and Owner agreed that Interstate's management and operation would not begin with pre-opening efforts but only upon actual Hotel opening. (Interstate's lengthy exposition on the pre-opening appendix only confirms that Interstate and Owner clearly treated "pre-opening" concerns differently than management and operation. Indeed, the appendix itself expressly distinguishes between its terms and the Management Agreement "pursuant to which Manager shall commence management on the Management Commencement Date ..." (emphasis added).) Interstate and Owner could have illogically set pre-opening as the commencement of management, but they did not, choosing instead to remain within the scope of reason. Since the parties have stipulated that the Hotel did not open until early 2002, Interstate's Hotel management and operation in early 2002 comes well within the MOA's undisputed post July 1, 2001 effective period. Accordingly, the MOA's card-count neutrality provisions apply.

<u>Expressio Unius ...</u>

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-22
Interstate Hotels & Resorts, Inc. &
Best Western
April 10, 2007
Page 5 of 11

In addition to the unambiguous express terms of the MOA and Management Agreement, principles of contract construction also support application of the card count neutrality provisions to the Hotel.

An axiom of contract construction holds that where one thing is expressly excluded, all other things are thereby included. *Elkouri & Elkouri, How Arbitration Works* (5th Ed.) p. 497. In this case, the MOA expressly excludes the Courtyard JFK from its coverage, thereby implicitly including other hotels, such as the Best Western, into the card count neutrality provisions.

Interstate attempts to refute such traditional construction by arguing that the Courtyard opened after July 1, 2001 and so had to be excluded. However, much as Interstate begrudges the Union's evidence that the Courtyard opened before July 1, 2001 (Union Ex 4), Interstate offers no evidence of its own to the contrary, even though Interstate apparently managed the Courtyard. Therefore, in the face of the only evidence presented, Interstate's attempt to evade normal contract construction fails. (Interstate's arguments also entangle one another. If, contrary to the express terms of the Management Agreement, the Chairman considers Interstate's pre-opening argument, the same should also apply to the Courtyard JFK. Thus, even the Courtyard's pre-opening activities would trigger management or operation, putting that hotel into the pre-July 1, 2001 date, yet the parties expressly excluded it.)

Falling back on an alternative rule of contract construction, Interstate claims that the Union's reading would render the MOA's July 1, 2001 effective date meaningless. In evaluating the Hotel's argument, it should be noted that contracts frequently state their effective date, which does not itself speak conclusively to the reach of the contract's terms. The date here is not meaningless because it anchors the MOA in time, but neither is it conclusive for excluding all hotels prior to July 1, 2001, especially where the contract goes out of its way to expressly exclude one such hotel. At most, the Chairman has before him two construction rules supporting contrary readings. Under these circumstances, any doubt should be construed against Interstate. Interstate knew of its pre-opening arrangements all along, while the Union, on signing the MOA in 2004, could only know that the Hotel opened and Interstate therefore commenced management in early 2002. Thus, rather than a fast and loose approach, Interstate should have expressly negotiated the Hotel's exclusion. Having instead opted for stealth and ambiguity, Interstate should now bear its consequences.

## Red Herrings Don't Float

Throughout its position letter Interstate points to a variety of irrelevant issues which should not be allowed to divert attention away from Interstate's obligation to apply the MOA at the Hotel.

First, while Interstate concedes as it must that it acts as Owner's agent, it argues that the Union's case somehow fails absent a finding of joint employer status. Contrary to this argument, the prior Interstate Awards proceed on either agency or joint employer status. Agency is not in dispute and is in fact expressly stated in the Management Agreement at § 2.1 ("Owner hereby appoints Manager as Owner's exclusive agent …") and elsewhere. Accordingly, Interstate and Owner are both joined to the MOA at least by the well-established principles of agency and the unrebutted evidence of industry practice in the Interstate Awards.

Second, Interstate claims that under § 3.2 of the Management Agreement "Interstate has no power to bind Owner to any collective bargaining agreement." As the union stressed at hearing, and as remains unrefuted, the MOA is an organizing agreement, not a collective bargaining agreement. Under labor law the MOA can not be a collective bargaining agreement. All the MOA effects is the process of obtaining recognition. If and when the Union wins majority status, then negotiations for terms

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

and conditions of employment would commence. Any issues regarding Owner and Interstate as to terms and conditions of employment, i.e. collective bargaining, remain for another day.

Third, the Union does not seek to be a third-party beneficiary of the Management Agreement. The Union does insist that the term "Management Commencement Date," fashioned in presumably arms-length negotiations between sophisticated business people, means what it says. It is not too much to expect as a matter of proof that the parties who created the term be bound by it.

Finally, Interstate erroneously claims that the Union did not provide sufficient evidence on a number of points such as joint employer status and the opening of the Courtyard JFK. (Interstate's claim is rebutted as to joint employer by the preface to the Management Agreement ("Owner desires to have Manager assist Owner in managing and operating the Hotel") and Owner's input on collective bargaining agreements, and by Union Exhibit 4 as to Courtyard opening. Interstate also makes an unsworn assertion of the parties' intent which should be ignored.) Should the Chairman apply the express terms of the Management Agreement's "Management Commencement Date" as the Union urges, these objections are irrelevant. If, however, Interstate succeeds in sowing confusion, then the Union would seek to subpoena evidence on these points long in Interstate's possession. In particular, in response to the Union's January request for all documents regarding Interstate's role as manager, Interstate produced the MOA without the pre-opening appendix (Union Ex. 1), presenting the appendix only minutes before the March 1 hearing began (Hotel Ex. 1). Interstate's initial production is consistent with the irrelevancy of the pre-opening appendix. If, however, Interstate insists, contrary to contract and logic, that the express terms of the Management Agreement are overridden by appendices and outside circumstances, the Union must be provided the facts regarding such appendices and circumstances. While the Union decries such delay caused by Interstate, and believes it utterly unnecessary in light of the "Management Commencement Date" provisions of the Management Agreement, Interstate's arguments do not lead to an award in its favor, but only to further proceedings before the OIC which will eventually sustain application of the MOA to the Hotel.

<u>Conclusion</u>

For the reasons and upon the authority set forth herein and in the Union's letter of February 23, 2007, the Union's grievance against Interstate should be sustained. Interstate and Owner should be ordered to apply the MOA card count neutrality provisions, which incorporate the IWA rules, to the Hotel immediately on the same terms as prescribed by Chairman Drogin in the prior Interstate Awards.

## Employer's Contentions

Although the Union claimed at the hearing that Interstate and the Owner of the Best Western are joint employers, the Union did not submit any evidence to prove that Interstate and the Owner of the Best Western are joint employers for any purpose. Thus, the Union has failed to meet its burden of proof as to this argument, and there is no factual basis for the Arbitrator to find a joint employer relationship between Interstate and the Owner.

If, however, the Arbitrator were to find that Interstate and the Owner of the Best Western were joint employers, which he should not, then and only then does the Arbitrator need to decide if Interstate is the agent of the Owner. In view of Section 3.2 of the Management Agreement, Interstate had no power to bind Owner to any collective bargaining agreement and thus, Section 2 of the Memorandum of Agreement cannot bind Owner in any respect.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

The only real issue in this arbitration is whether the neutrality provisions of the Memorandum of Agreement apply to the Best Western because the Best Western formally opened to the public after July 1, 2001 – even though Interstate "came" to have an obligation to operate and manage this Hotel prior to July 1, 2001. The Union made two – albeit spurious – arguments in this regard. First, that the Memorandum of Understanding does not specifically exclude the Best Western and does exclude a certain Marriott Hotel. The Union introduced a single piece of evidence – a vague January 19, 2000 article entitled "New Courtyard by Marriott to be built at JFK- John F. Kennedy International Airport" ostensibly to demonstrate that the July 1, 2001 date was meaningless since the Marriott, which was specifically excluded from the Memorandum of Agreement, may have opened prior to July 1, 2001. (Union Ex. 4.)

This Article proves nothing and states only that as of January 19, 2000, it was anticipated that "[c]onstruction on the 13-floor hotel [was] targeted to be completed early next year." This lone article is not relevant to draw any conclusions about Interstate's intent in entering into the Memorandum of Agreement and it certainly is contrary to the plain reading of the Memorandum of Agreement, namely, that the Marriott was not the sole exception to its neutrality provisions. In fact, the reason that the Courtyard by Marriott at the JFK was specifically excluded was because that hotel and another owned hotel owned by the same party were specifically being negotiated just prior to agreement on the Memorandum of Understanding, and because the parties had specifically agreed to the exclusion of that hotel from the Memorandum. However, because the Marriott Courtyard was specifically excluded as a hotel that otherwise might fall within the Memorandum's neutrality and card check section, does not support the argument that Interstate did not want to exclude from the neutrality provisions of the Memorandum of Agreement any other hotel which Interstate was obligated to operate and manage prior to July 1, 2001. The July 1, 2001 date stands as an independent date which limits the neutrality provision's applicability. The Union's second argument is that the July 1, 2001 date in the Memorandum of Agreement has no meaning whatsoever. If, as the Union contends, the sole exception to the neutrality provision is the Marriott JFK, there would have been no need to include the July 1, 2001 date in the Memorandum of Agreement because the Marriott JFK would have been excluded regardless of when it opened. The inclusion of the July 1, 2001 date was intended to, and did exclude, agreements which had been entered into before that date, such as the Pre-Opening Agreement, which was effective on June 1, 2001, and the Management Agreement which became effective on June 6, 2001. Indeed, to accept the Union's argument would be to render a key contract provision -- the July 1, 2001 date -- meaningless. It is hornbook law that a document must be construed to give meaning and effect to all its terms. Daigle v. West, 225 F. Supp. 2d 236, 246-47 (N.D.N.Y. 2002) (it is a "'cardinal principle of contract construction . . . that a document should be read to give effect to all its provisions and to render them consistent with each other'") (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)). The Union's reading of the Memorandum of Agreement violates this well-established tenet of contract construction and would read the July 1, 2001 date out of the Memorandum of Agreement.

Despite the fact that Interstate's obligation to operate and manage the Best Western arose prior to July 1, 2001, the Union relies solely on a definition in Section 2.2 of the Management Agreement, which provides that Interstate "shall assume management and operation of the Hotel upon the date the Hotel opens for business, which is expected to be on or about October 1, 2002 (the "Management Commencement Date"). This argument also misses the mark and seeks to place too much emphasis on the term "Management Commencement Date" used in the Management Agreement to which the Union was not a party. In essence, the Union is improperly seeking to become a third party beneficiary of the Management Agreement. (The Union cannot establish that it is a third party beneficiary to the Management Agreement, because it is clear that the contract at issue, the Management Agreement, was not intended for its benefit and any benefit that the Union could claim was clearly incidental and not immediate to the time that the Agreement was executed.) The term, "Management Commencement Date,"

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

which was perhaps inartful, was used for the convenience of demarcating management and operational tasks that were to occur before and after the formal opening of the Best Western.

As demonstrated at the hearing, the reality of the relationship between Interstate and the Owner is that Interstate was in charge of operating and managing all activities at the Best Western as of June 1, 2001, the date of execution of the Pre-Opening Agreement, and certainly no later than June 6, 2001, the date of execution of the Management Agreement. Both of these documents, introduced at the hearing by Interstate, unequivocally demonstrate that as of June 2001, Interstate and the Owner expected that Interstate would manage the Hotel effective with the signing of these documents and well prior to the "Management Commencement Date."

Thus, the Pre-Opening Agreement, which is incorporated into the Management Agreement at Section 6.1, recognizes these realities of the relationship and designates various activities to be undertaken by Interstate prior to the opening of the Best Western. Thus, prior to the formal opening of the Best Western, Interstate was responsible for recruiting, relocating, employing and training Hotel management and staff; providing personnel to assist in pre-opening activities; assisting the Owner in applying for and procuring necessary licenses and permits; preparing two business plans within 60 days of the execution of the Pre-Opening Agreement -- one for pre-opening activities and one for the first year of operation of the Hotel; implementing a pre-opening marketing plan; and providing all other incidental services necessary to enable the Hotel to open for business on the Management Commencement Date.

In recognition of the fact that such activities required funding, Interstate received from the Owner, $50,000.00 of operating funds to open the Hotel's Agency Account and finance the pre-opening activities. The Pre-Opening Agreement further provides that Interstate will receive a $75,000.00 fee if the Hotel does not open prior to March 31, 2002. Thus, Interstate was bound by this agreement until at least March 31, 2002. (See also Section 11 of the Management Agreement.) In the event that the Hotel opened prior to March 31, 2002, which the parties stipulated it did, said fee would be waived. Finally, the Pre-Opening Agreement provided that the Owner would indemnify Interstate from claims arising out of the performance of the Pre-Opening Agreement.

The Management Agreement likewise recognizes that Interstate was responsible for performing the full panoply of management and operating tasks prior to the date the Hotel could open for business. The following provisions reveal the extensive scope of that relationship:

- Section 3.1 identifies the authority of the manager and various of the tasks identified in paragraphs A-D must be undertaken prior to the opening of the Hotel, such as hiring of employees, establishing prices and policies, administering leases and concession space and negotiating service contracts.

- Section 4 provides that the Owner shall furnish all operating expenses in order to ready the Hotel for opening and in operating the Hotel.

- Section 6 makes it clear that Interstate is the agent of Owner, which will provide funds pursuant to the Pre-Opening Agreement to be placed in an Agency Account. Operating funds shall be used to ready the Hotel for opening and in operating the Hotel. In recognition of the fact that there may be various additional start up expenses during the initial 90 days of the agreement, Owner was to provide an additional $25,000.00 of "Surplus Start-Up Working Funds." These funds are in addition to the

#2007-22
Interstate Hotels & Resorts, Inc. &
Best Western
April 10, 2007
Page 9 of 11

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

original $50,000.00 provided pursuant to the Pre-Opening Agreement.
Section 16.2 also confirms that the relationship between Interstate and
Unigroup is one of agency.

- Section 8 requires that Interstate prepare annual business plans and is
  consistent with the requirements in the Pre-Opening Agreement that
  Interstate prepare business plans for the pre-opening period and the
  first year of operation.

- Section 9 addresses the manager's fees and reimbursement and recognizes
  that start up costs are part and parcel of the agreement. As a result,
  the base management fee begins at 2% of gross operating revenues at the
  outset of the agreement including the remaining months of 2001 and all of
  2002. It is reduced to 1_% for the ensuing years of the five-year
  agreement.

- Section 11 confirms the provisions of the Pre-Opening Agreement and
  provides that that the agreements between the parties are in full force
  and effect, unless the Hotel does not open by March 31, 2002.

- Like the Pre-Opening Agreement, Section 15 of the Management Agreement
  provides that the Owner shall indemnify Interstate for all claims in
  connection with its operation of the Hotel.

- Section 16.11 contains a time is of the essence provision, which would be
  irrelevant if, as the Union suggests Interstate's obligations commenced
  on the Management Commencement Date.

To be sure, the plain reading of the Pre-Opening Agreement and Management
Agreement reveal that in order to reach the Management Commencement Date, Interstate
was required to have funds, hire and train employees, procure permits and licenses and
engage in quintessential management duties so that the Hotel could open. Interstate
provided indisputable evidence that the Pre-Opening Agreement and Management
Agreement, both of which were executed and effective in June 2001, prior to the July
1, 2001 date contained in the Memorandum of Agreement addressing neutrality issues,
among other items, were intended to be excluded from the reach of that agreement.

For all the reasons set forth above, we respectfully request that the
Arbitrator deny the Union's grievance and find that the Best Western is excluded from
the provisions of the Memorandum of Agreement.

## DISCUSSION

The Chairman must sustain the grievance, essentially for the reasons set forth in
the Union's briefs.

An arbitrator's most elemental mandate is to read contract language plainly and
consistent with its stated objectives, if any, as often found in preambles and other
introductory clauses. Interstate's agreement to allow the Union organizational access,
consistent with the accretion and card count/neutrality provisions contained in the then
in effect IWA "to any hotel or concessionaire in the New York City area which came or
comes to be owned, operated or managed by Interstate since July 1, 2001, without

APR. 10. 2007  1:35PM

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

prejudice or limitation " must have been for some real consideration and the Union is entitled to exercise its rights to the fullest extent if the quoted condition is met. The plain intent is that where Interstate is doing any one of those things it must open its doors in a neutral way for the Union to attempt to win over the workers' support. Only one hotel is expressly excluded from the application of this commitment, namely, Courtyard by Marriott JFK. Because there is no question that Interstate manages the Best Western Hotel, the only basis to excuse compliance is if its management pre-dates the July 1, 2001 commencement date. The stipulation that the Hotel opened in February or March 2002, clearly after the commencement date in the MOA, surely gives rise to a presumption that the neutrality provisions were triggered and, thus, that Interstate has the burden of rebutting it by showing that "management", as that term is used in the MOA, occurred before July 1, 2001. It failed to do so.

Interstate furnished to the Union a copy of a Management Agreement which pre-dates, by a month, the "look back" date of the MOA -- July 1, 2001. Agreements of this type, and this one is no exception, set forth mutual expectations and correlative rights and obligations which may or may not be actually effective on the dates contemplated therein, and may never become operative. The Employer submitted LA 2001 which references the Management Agreement, curiously dated five days hence, essentially to support its thesis that its management or operation of the Hotel constitutes conclusive evidence that such conduct commenced prior to the effective date of the MOA. By its terms, LA 2001 distinguishes the management and operation of the Hotel from so-called pre-opening activities. As the Chairperson reads them, those activities, in the main, are such as would lead to the opening of a hotel, that is, a place where the public can find lodging and other services but which may never be fulfilled or may be greatly delayed. Article II, Section 2.2 of the Management Agreement clearly shows that Interstate assumes management and operation of the Hotel **upon the date the Hotel opens for business.** This is referred to as the management commencement date. Article I, Section 1.7 thereof defines that phrase as the date Interstate assumes management of the Hotel. That event, the opening of the Hotel, did not occur until after the look back date of July 1, 2001. Notably, Interstate did not submit any evidence, other than Employer Exhibit 1, to demonstrate that it managed or operated the property before that date. What it offers is mere speculation based on likelihood. The occurrence of the management commencement date triggered certain changes in Interstate's compensation formula according to LA 2001 and it is fair to presume that this was because the agent had passed from the preparation phase to the active management of a hotel. This differential for pre- and post-management commencement date activities argues strongly against Interstate's contention that the pre-opening work should be considered "management" for purpose of the MOA. Moreover, there was no evidence that the expected change in compensation and, hence, the triggering of the management commencement date as Interstates perceives it, occurred on or before midnight of June 30, 2001 or even before the opening in March 2002. In sum, I find that whatever pre-opening activities were conducted in connection with the Best Western

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212   FAX: (212) 541-9356

property are not management for the purposes of the MOA and, accordingly that "management" as used in the MOA occurred after July 1, 2001.

Because Interstate knew that it was an operator and manager of the Best Western at the time the MOA was consummated in 2004, it was incumbent upon Interstate to specifically exclude Best Western from the scope of the MOA as it had done with Courtyard by Marriott JFK.  Interstate had the wherewithal to protect itself from the claim here by simply adding the Best Western to the class of excludables. It did not do that nor pretend to do that and, thus, must accept the consequences. I agree with the Union that the judicial construction rule of *inclusio unis, est exclusio alterius* applies here.

Interstate is wrong in arguing that the Union's use of the Management Agreement's terms is either improper or inapposite because the Union is not a third-party beneficiary thereto.  The MOA does not specify which party carries a burden of proof but the nature of that accord compels me to find that Interstate, acting for the owner of the Hotel, when not itself, must be forthright and cooperative in disclosing the true nature of relationships so as not to thwart the Union's rights.  The Management Agreement is simply a piece of proof on the journey to establish a critical fact needed to establish or disprove the application of the concept of ownership, operation or management by Interstate and, by extension, agency.  Again, a building becomes a hotel only when it is ready to provide lodging and other related services to members of the public or, in the case of timeshare ownership, to shareholders.  Here, that occurred after the effective date of the MOA.

For these reasons and for the reasons set forth in the two prior decisions involving these parties, the Chairperson must sustain the Union's grievance and direct Interstate, as agent of the Owner, and the Owner of the Hotel, which engaged Interstate to operate and manage the Hotel, to comply with the MOA card count neutrality provisions, including those under the IWA, consistent with the awards rendered in IC Award Numbers 2007-08 and 2007-10.

It is so ordered.

Dated:        April 10, 2007
              New York, New York

              ELLIOTT SHRIFTMAN, under the penalties of perjury duly affirms
              that he is the arbitrator described herein, and that he executed the
              foregoing instrument.

              IMPARTIAL CHAIRPERSON

#2007-57
Best Western Convention Center
August 8, 2007
Page 1 of 2

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

## EMPLOYER:  BEST WESTERN CONVENTION CENTER

HTC Case #U07-282/Emergency hearing requested by the New York Hotel & Motel Trades Council, AFL-CIO, re:  Management's failure to comply with Article 60 and Addendum 4 of the IWA.

Hearings held at the Office of the Impartial Chairperson on August 8, 2007.

## APPEARANCES:

| | |
|---|---|
| For the Employer: | No Appearance |
| Counsel for the Employer:<br>By: | Seyfarth Shaw<br>Paul Galligan Esq. |
| For the New York Hotel & Motel Trades Council, AFL-CIO:<br>Counsel:<br>By: | Pitta & Dreier, LLP<br>Joseph Farelli, Esq. |
| For the Union: | Brian Lysell<br>Mario Rodriquez<br>Elizabeth Guerra |

\*    \*    \*

After discussion amongst the parties, I am issuing the following Consent Award.

1. I direct that the Hotel shall cease and desist from violating Article 60 of the IWA and Addendum IV;

2. I direct that the Hotel shall take all steps necessary to ensure that Article 60 and Addendum IV are complied with in total;

3. I direct that the Hotel General Manager issue both a written and verbal statement to all employees, which is spelled out in Appendix A, attached hereto. The Statements shall be issued in English and Chinese. The Union's organizers shall be present during the reading and shall be permitted to have a Chinese Interpreter also present. All Hotel managers and supervisors shall be present at

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

the time when the verbal statement is made.  The verbal statement shall be made to employees during working time. The written statement shall be posted prominently in the Hotel and attached to each employee's paycheck.

4. The Hotel shall cover all surveillance cameras in the areas where Union organizers meet with employees.

5. The Hotel General Manager shall keep closed his office door while Union organizers are on the Hotel premises.

6. Hotel shall pay the two employees for the time they spend appearing at today's hearing for which they were subpoenaed

Dated:     August 8, 2007
           New York, NY

IRA DROGIN, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

_____
IMPARTIAL CHAIRPERSON

#2007-57
APPENDIX A
Best Western Convention Center Hotel
August 8, 2007

I have an important statement to make in order to clarify the events of the last several days and would appreciate each associate's attention to what I have to say.

During the past few weeks since Union organizers have been coming into the Hotel to talk to associates, certain managers, including myself, may have expressed certain opinions and may have behaved in a way, which suggested that management was opposed to the Union. As a result, associates who trusted these managers may have gotten the impression that there was a possibility that, if the Union were voted in, your conditions at work might get worse, that you might lose benefits or privileges you currently enjoy, that the Union might charge you $8,000.00 for dues, or that you might even lose your job.

If any manager gave anyone that impression, it was wrong and inaccurate information. Furthermore, managers or supervisors, including myself, are not permitted to make promises, such as higher wages, if you agree not sign a union card. Such promises are false and, in fact, illegal.

The fact is that if you vote in the Union, Hotel Management will negotiate a fair contract with the Union. The Hotel will not try to take away any of your current benefits or try to terminate you because of your support for the Union.

I understand that the Union has a history of negotiating contracts which protect and improve the benefits, wages and working conditions that the employees had before they voted in the Union.

The truth is, our managers, including me, have little or no experience in Union Hotels and almost no knowledge about union contracts, benefits choices at Union Hotels or the process of negotiating a contract.

If any manager gave any associate the impression that they would be angry if any associate exercised their right to choose a union, we are very sorry. If any manager made you believe or you understood that the Union would check your immigration status or work papers, I want to make it clear that that is not true. You have an absolute right to join the union. You have this right regardless of your citizenship or immigration status. You should understand that no one in Hotel Management will tolerate it if any Hotel managers treated you differently because you support the union.

Also, it is a fact that if you sign a union card, neither I nor any other manager or supervisor will know about it unless you choose to make it public. The Union cards are confidential and only the union organizers and an independent, impartial arbitrator will see those cards.

I sincerely apologize on behalf of all Hotel managers if the incorrect statements some managers may have made caused any team member any confusion or discomfort. I also apologize if their behavior communicated any disrespect or hostility toward any of the union organizers or toward the team members who support the union.

# EXHIBIT C

{00291191.DOC;}

Mar-18-2004 01:33pm   From-NY.HOTEL & MOTEL TRADES COUNCIL   4218017074   T-830  P.002/003  F-818

Vinn 2



## AGREEMENT

MEMORANDUM OF AGREEMENT entered into this 15th day of January, 2004 between the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO ("Union") and INTERSTATE HOTELS AND RESORTS and its affiliates/subsidiaries ("___")

NOW, THEREFORE, the parties agree as follows:

1. Effective as of the date of this Agreement and retroactive to July 1, 2001 Interstate agrees to be bound by the Accretion and Card Comm/Neutrality provision of the Memorandum of Understanding dated June 18, 2000 between the Union and Hotel Association of New York City, Inc. ("Hotel Association"), such that the Union shall be able to apply the Accretion and Card Comm/Neutrality provisions to any hotel or consolidation in the New York City area which came or comes to be owned, operated or managed by Interstate since July 1, 2001, without prejudice or limitation. The parties agree that this paragraph shall not be applicable to the Courtyard by Marriott JFK located at 145-11 North Conduit Avenue, Jamaica, New York by virtue of Interstate's management thereof.

2. Interstate agrees to adopt, assume and be bound by all the terms and conditions of employment, both economic and non-economic in nature, of any successor collective bargaining agreement to the Industry Wide Agreement between the Union and the Hotel Association, which expires on June 30, 2006 ("IWA") negotiated between the Hotel Association and Union, which shall serve to extend, supersede and/or modify the IWA, on its own behalf and on behalf of any hotel or consolidation which it currently or hereafter owns, operates or manages in the New York City area.

3. The Union agrees that the Park Central Hotel shall be permitted to lease out part of the property to Starbucks who will operate a retail store on said property. Provided that there shall be no entrance or access to Starbucks from inside the Hotel and that no Starbucks employees will perform any duties or functions currently performed by bargaining unit members, Starbucks will not be considered a consolidation within the meaning of the IWA nor subject to the accretion and area standards provisions of the IWA.

Union 00144



4.  Any dispute regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, which are incorporated herein by reference.

Dated: January 12, 2004

NEW YORK HOTEL AND MOTEL                    INTERSTATE HOTELS AND RESORTS
TRADES COUNCIL, AFL-CIO

By _____              By _____
                                             Paul Burke

Union 00145

# EXHIBIT D

{00291191.DOC;}

AGREEMENT entered into so as to be effective July 1, 2001 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., in its own behalf and in behalf of the HANYC BARGAINING GROUP HOTELS[1] (hereinafter collectively referred to as the EMPLOYER or the ASSOCIATION); and the operators of hotels and motels who are active members of the ASSOCIATION and with respect to whom the UNION (as herein below described) presently has contractual relations, and the operators of hotels, motels, and concessionaires with respect to whom the UNION may be hereafter designated as sole collective bargaining agent for the employees of such hotels, motels, and concessionaires; and who shall become parties hereto by agreeing to this Agreement, each and every such hotel, motel, and concessionaire being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereafter to be employed by the EMPLOYER.

## WITNESSETH:

WHEREAS, the ASSOCIATION is an organization whose active members are engaged in the hotel business in the City of New York and one of whose objects is to promote fair and harmonious labor relations between hotel keepers and their employees, and

WHEREAS, the parties hereto are signatories to a Collective Bargaining Agreement signed June 26, 1985, as amended by a Memorandum of Understanding signed January 30, 1990 (hereinafter collectively referred to as the "1990 Agreement"), which 1990 Agreement by its terms, expired on June 30, 1995, and was extended by the parties to midnight July 4, 1995, and further amended by a Memorandum of Understanding signed July 5, 1995 (hereinafter collectively referred to as the "1995 Agreement"), which Agreement by its terms, expired on June 30, 2001;

WHEREAS, the parties hereto, desiring to cooperate to stabilize such labor relations by establishing general standards of wages, hours of service and other conditions of employment, and providing arbitral machinery whereby disputes and grievances between employers and employees may be adjusted without resort to strikes, lockouts or other interferences with the continued and smooth operation of the hotel business, have agreed,

[1] A list of HANYC Bargaining Group Hotels has been provided by the Association.

7

management or operational control of the Hotel or Concessionaire such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

Not less than five (5) business days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and the transferee and the notice to the UNION will provide the full and complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement between the EMPLOYER and the transferee pursuant to which the transferee agrees to assume this Agreement.

Said notice will be held by the UNION in strict confidence and the UNION, upon request of the EMPLOYER, will agree to a confidentiality pledge upon terms mutually acceptable to the EMPLOYER and the UNION; provided however that such confidentiality pledge will be ineffective upon the EMPLOYER's violation of this Section 59. If the UNION is provided with a signed copy of the portion of the agreement where the transferee agrees to assume this Agreement, the UNION will not contact the transferee prior to the closing.

The EMPLOYER and UNION agree that if a determination is made by the Impartial Chairman that a violation of Section 59 has occurred, then in such case, the violation will be deemed to be irreparably harmful to the UNION and its members. In such event, the UNION may seek such relief as is necessary to redress such violation and remedy such violation and irreparable harm, including but not limited to the award of monetary damages and/or injunctive relief either from the Office of the Impartial Chairman, the National Labor Relations Board, a court of competent jurisdiction or such other forum as deemed appropriate by the UNION.

## ACCRETION AND NEUTRALITY/CARD CHECK

60.  (A) Accretion

EMPLOYER agrees to the accretion of any and all hotel or concessionaire properties which come to be owned and/or managed in the New York City area to the bargaining unit(s) presently or hereafter covered by the Industry Wide Agreement or any successor collective bargaining agreement thereto, and that all of the terms and conditions set forth in the

70

Industry Wide Agreement or its successor shall be immediately applicable to the accreted bargaining unit(s).

The parties acknowledge that they have negotiated and exchanged valuable consideration in reliance upon the lawfulness and validity of their agreement but recognize the complexity and change inherent in the legal doctrine of accretion. Nevertheless, in the event that any accretion at a hotel or concessionaire pursuant to these provisions, applied to the fullest extent of that legal doctrine, should be ruled ineffective, invalid, or unenforceable by competent legal authority, then the parties hereby agree that the neutrality and card count agreement annexed hereto as Addendum IV shall apply to that hotel or concessionaire. For the purposes of this provision, "competent legal authority" shall mean the Office of the Impartial Chairman, the Regional Director for Region 2 or 29 of the National Labor Relations Board ("NLRB"), the United States District Courts for the Southern or Eastern Districts of New York, or the United States Court of Appeals for the Second Circuit.

The parties agree that they shall meet to review and discuss such particular facts and circumstances as either party may contend warrants mutually agreed upon revisions to the provisions of the Industry Wide Agreement, or successor collective bargaining agreement as the case may be.

(B) Neutrality/Card Check

In addition to and without limiting the other provisions of this Section 60, EMPLOYERs shall abide and be bound by the neutrality and card check provisions annexed hereto as Addendum IV and incorporated herein by reference.

## MAINTENANCE AND ELECTRICAL WORK

61.  It is intended that employees to be classified as in the "Maintenance Department" shall include those engaged in doing plastering, mason work, tile setting, lathing and cement work carpentry, plumbing and steamfitting, upholstering and mattress making; painting, furniture varnishing and paperhanging; operating and maintaining house radio systems; mechanical work on elevators; machine work, locksmithing and key work; silversmithing, coppersmithing and tinsmithing, boiler repair work.

The painting, decorating and paperhanging includes the service

71

after a union is decertified as bargaining agent. All contributing employers are urged to obtain legal advice as to the foregoing withdrawal liability.

## ADDENDUM IV

Company Name

Address

Dear _____:

This letter agreement will confirm the discussions we have had regarding the procedures to be followed by the New York Hotel & Motel Trades Council ("Union") to organize certain employees at hotels and concessionaires at which Company acquires an ownership, management or control interest and the Union does not have representational rights ("Hotel"), and various other matters, including the resolution of disputes related to such organizational drive and/or the terms of this letter agreement ("Agreement") and any subsequent collective bargaining agreement.

### 1. Use of Impartial Chairman

The Impartial Chairman of the Hotel Industry of New York City ("Impartial Chairman") will conduct a "card count" to determine whether the Union has obtained valid cards from a majority of full-time and regular part-time employees of the Hotel, employed in job classifications listed in Schedule A to the Industry Wide Agreement between the Union and the Hotel Association of New York City Inc. ("IWA"), designating the Union as their representative for purposes of collective bargaining (the "Cards") and to certify the result of his card count, all in accordance with the procedures set forth in Section III below. Full-time and regular part-time employees of the Hotel employed in job classifications listed in Schedule A shall be referred to throughout this Agreement as "Employees".

The Impartial Chairman also will resolve any and all disputes of any kind whatsoever arising out of this Agreement, or concerning the meaning or interpretation of any and all matters discussed herein, including but not limited to the terms and provisions of any collective bargaining agreement entered, or to be entered into, by and between the Hotel and the Union. Any costs incurred by the parties in instituting proceedings before the

111

Impartial Chairman, or defending against the same, shall be the responsi-
bility of the respective party. Costs charged by the Impartial Chairman shall
be shared and paid equally by the parties. Any arbitration award or deci-
sion issued by the Impartial Chairman, written or otherwise, shall be final
and binding upon the parties, and subject to the provisions of Article 75 of
the New York Civil Practice Law and Rules ("CPLR") including, but not lim-
ited to, the procedures to vacate or modify an award pursuant to Section
7511 of the CPLR, and shall be enforceable in a court of competent juris-
diction.

### 2. Union Access to the Hotel

The Union will begin its organization of the Hotel's employees at any
time upon notice to the Hotel's General Manager. The Union will be permit-
ted to have its organizers or representatives enter the Hotel to meet with
Employees during the Employees' non-working times (for example, before
work, after work, and during shift changes, meals and breaks) and/or dur-
ing such other periods as the parties may mutually agree upon in writing.
The Union may engage in organizing efforts in non-public areas of the
Hotel such as the Employee mealrooms and locker rooms or such other
non-public areas as the parties may mutually agree upon.

Within three (3) days following receipt of the above described written
notice of intent to organize Employees, the Employer will furnish the Union
with a complete list of such Employees, including both full and part-time
Employees, showing their job classifications and departments, work sched-
ules, wages, and benefits, and the home addresses and telephone num-
bers of all Employees. Thereafter, the Employer will promptly provide
updated lists for the duration of the organizing drive.

There shall be no lockouts of the Employees by the Hotel and the
Union shall not cause any disruption of work by the Employees during the
organizing activity, nor shall there be any picketing, strikes, slow downs or
other work stoppages at the Hotel by or caused by the Union for any pur-
pose, including organizing, contract negotiations, dispute publication or
enforcement of the terms of this Agreement. The "no lockout, no strike" pro-
visions hereof shall not apply in the event either party fails to abide by an
award or decision of the Impartial Chairman within three (3) business days
after issuance. Both the Hotel and the Union agree to respect the National

112

Labor Relations Act ("NLRA") Section 7 rights of, employees during the
Union's organizing drive, and neither party shall, or be required to, act in
contravention of those rights. The Hotel specifically agrees that its supervi-
sory employees, its agents and/or its representatives will not act or make
any statements that will directly or indirectly imply the Hotel's opinion as to
whether or not the employees should support the Union or as to the repu-
tation of the Union or any of its officers and affiliate local unions or as to the
reputation of any of the officers of the Union's affiliate local unions and/or
their parent unions.

### 3. Determination of Majority Status

At any time after the commencement date of the Union's organizing
effort, the Union may request that a card count be conducted by the
Impartial Chairman. The Union shall initiate that process by advising the
Hotel's General Manager in writing ("Notification Letter") that it represents
a majority of the full-time and regular part-time employees employed by the
Hotel in the job classifications set forth in the IWA Schedule A. The date of
the Union's Notification Letter shall be the date ("Notification Date") used
for purposes of determining the composition of the list of the names of the
Employees to be furnished by the Hotel to the Impartial Chairman, so that
all full-time and regular part-time Employees of the Hotel employed on or
before the Notification Date will be the only Employees whose names will
appear on the list.

Within forty-eight (48) hours of the delivery of the Notification Letter by
the Union to the Hotel indicating its majority status, the Union shall notify
the Impartial Chairman in writing that his services are requested for purpos-
es of conducting a card count. The Union shall immediately confirm to the
Hotel's General Manager that the Impartial Chairman has retained jurisdic-
tion of the card count proceeding. As soon as practicable thereafter, but in
any event no later than seven (7) days after the date of the Union's written
card count request made to the Impartial Chairman, the Union shall furnish
to the Impartial Chairman the Cards it has obtained from the Employees,
and the Hotel shall furnish the Impartial Chairman the list containing the
names, job classifications and social security numbers of Employees
employed as of the date of the Union's Notification Letter (with a copy to
the Union) together with copies of official employment documents contain-

113

ing the signatures of each of the Employees (e.g. Forms I-9, Form W4 or similar documents), in care of the Office of the Impartial Chairman, 321 West 44th Street, New York, New York 10036.

Within forty-eight (48) hours after its receipt of the documents described above, the Impartial Chairman shall conduct a card count by checking the Cards against the list of Employees and by comparing the Employees' names and signatures appearing on the Cards to the names and signatures appearing on the employment documents supplied to the Impartial Chairman by the Hotel. At the conclusion of the card count, the Impartial Chairman shall inform the parties of the results of his count and shall certify in writing that either the Union has or has not been selected by a majority of eligible Employees of the Hotel as their collective bargaining representative. Both the Hotel and the Union agree to abide by the determinations made by the Impartial Chairman regarding any challenges either to the validity of the Cards, the eligibility of Employees, the appropriateness of the unit and/or to the majority status of the Union.

If, after the conduct of the card count, the Union fails to be certified by the Impartial Chairman as the majority representative of the eligible Employees, this Agreement shall be deemed to continue in full force and effect, unless it is otherwise terminated in writing by mutual agreement of the parties. Notwithstanding any of the foregoing seemingly to the contrary, the Hotel and Union also agree that the Impartial Chairman shall be empowered to issue such remedial orders as are consistent with applicable NLRB standards and necessary during and after the pendency of the Union's organization drive to ensure the maintenance of the neutral environment and/or to penalize the Hotel or the Union for violating their obligations hereunder, including an order to bargain in accordance with applicable NLRB standards, and/or monetary or punitive damages to either party.

If the Union is certified as the majority representative of the Employees, the Hotel must recognize the Union and the Hotel and the Union will commence negotiations within seven (7) calendar days of the date of the certification, at a mutually agreeable time and place, for a collective bargaining agreement covering wages, hours and other terms and conditions of employment (the "Agreement").

I believe that the above correctly describes our discussions on these matters. Please signify your concurrence by signing where indicated below

114

and returning one copy to me, the other being for your files.

Very truly yours,

Peter Ward
President

Accepted, Agreed and Accepted
on behalf of Hotel/Company

By: _____
Name: _____
Title: _____
Date: _____

## ADDENDUM V

Extra Rooms/Wage Equalization Lawsuit

a. Effective August 1, 1990:

(i) Room Attendants shall no longer be assigned to make up extra rooms without being compensated for them at the extra room rates specified in the Agreement.

(ii) The base weekly rates of pay for both bath and night shift room attendants will be equalized to the base weekly rates of pay of day shift room attendants.

b. In consideration of the foregoing, the parties shall do everything necessary in accordance therewith, withdrawing and terminating the various actions in the United States District Court for the Southern District of New York entitled and referenced as: New York Hotel and Motel Trades Council, AFL-CIO, et al. v. Hotel Association of New York City, Inc. et al., 89civ 0216, 0222, 0223, 0225, 0226, 0227, 0228, 0229, 0239, 0231, 1020 and 3925 and all proceedings relating thereto, including any and all charges or complaints filed with the Equal Employment Opportunity

115

# EXHIBIT E

{00291191.DOC;}

#2007-20CC
U07-368
Best Western Convention Center
August 24, 2007
Page 1 of 2

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212   FAX: (212) 541-9356

**EMPLOYER**: BEST WESTERN CONVENTION CENTER

HTC Case #U07-368/ The New York Hotel and Motel Trades Council, AFL-CIO, request a Card Count for all Employees.

Hearing held at the Office of the Impartial Chairperson on August 24, 2007.

**APPEARANCES:**

For the Employer:              Waseem Khan
                               Raymond Sun
                               Human Resources

Counsel for the Employer:      Seyfarth Shaw, LLP
             By:               Peter Walker, Esq.

For the New York Hotel & Motel Trades Council, AFL-CIO:
Counsel:                       Pitta & Dreier LLP
             By:               Joseph Farelli, Esq.

For the Union:                 Rich Maroko, Esq.
                               William St. Pierre
                               Local 6

*   *   *

Pursuant to the Industry-Wide Agreement ("IWA") by and between the New York Hotel and Motel Trades Council, AFL-CIO ("Union") and the Hotel Association of New York City, Inc., regarding recognition of the Union, the undersigned conducted a "card count" with respect to a group of workers employed by the Best Western Convention Center ("Hotel") or ("Employer") consisting of all **regular full-time and part-time employees** ("Unit").

The Union presented authorization cards designating the New York Hotel & Motel Trades Council, AFL-CIO as the exclusive bargaining representative.

The parties stipulated that the Unit consists of 21 employees with a difference of opinion on the eligibility of one additional employee, the Front Desk

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-20CC
U07-368
Best Western Convention Center
August 24, 2007
Page 2 of 2

Manager. With her, the total Unit is made up of 22 employees. The parties stipulated that a card count would be taken of the Unit made up of the 22 employees listed on Exhibit A, subject to the Union challenging the eligibility of the Front Desk Manager, Molliny Viriri , if her inclusion in the Unit is determinative of whether the Union represents the majority of employees in the Unit.

Accordingly, I compared the signatures on the authorization cards with the signatures made by the same Employees furnished to me on official employment records by the Employer in private. The authorization cards have not been reviewed by the Employer.

My review of the cards was conducted in complete secrecy without any representative of the Employer or Union present. I conclude that the Union presented valid authorization cards from a majority of workers in the unit.

Accordingly, I designate the New York Hotel & Motel Trades Council as the bargaining agent for the Unit at the Hotel.

Dated:      New York, New York
            August 24, 2007


            PHILIP ROSS, under the penalties of perjury duly affirms
            that he is the arbitrator described herein, and that he
            executed the foregoing instrument.


            PHILIP ROSS
            Office of the Impartial Chairperson