# Exhibit D

## ASSIGNMENT OF MANAGEMENT AGREEMENT

**THIS AGREEMENT** made and entered into on the 7th day of February 2005 by and between UNIGROUP HOTEL LLC, a New York Limited Liability Company, whose principal place of business is at 54 Canal Street, 3rd Flr, New York, NY 10002 (hereinafter referred to as Assignor) and 522 W. 38TH ST. NY LLC, a New York Limited Liability Company, whose principal place of business is at 147-25 Northern Blvd., Suite 3B, Flushing, New York 11354 (hereinafter referred to as Assignee)

### RECITALS:

1. Assignor is the "Owner" referred to in the Management Agreement dated June 6, 2001 for the management and operation of the Hotel located at 522-524 W. 38th Street, New York, New York with Crossroads Hospitality Management Company LLC(Manager) ( hereinafter referred to as the "Management Agreement").

2. Assignor wishes to have said Management Agreement assigned to Assignee in connection with the sale and purchase of the Assignor's property located at 522-524 W. 38th Street, New York, New York pursuant to the Contract of Sale dated February 12, 2004 and First Amendment dated November 19, 2004, and Second Amendment dated the date hereof (the purchase transaction);

3. Assignee acknowledges that Assignee has been given a copy of the Management Agreement and has read the same and has sought any legal advice concerning the same;

4. The Assignor herein transfers to the Assignee all the rights and obligations for the payment and performance of the provisions therein and that the Assignee agrees to assume all the rights and obligations for the payment of the management fee and the performance of all the terms, conditions and provisions of the Management Agreement.

**NOW THEREFORE,** in consideration of the sum of $10.00 and other good and valuable consideration, the parties agree as follows:

1. Assignor hereby assigns to Assignee the Management Agreement dated June 6, 2001 with respect to management and operation of the Hotel located at 522-524 W. 38th Street, New York, New York.

2. The Assignee does hereby assume the obligations pursuant to said Management Agreement including but not limited to the payment of the management fee as set forth in the Management Agreement as of the date hereof.

3. Assignor represents that the Management Agreement is in good standing and has not been modified or amended by Assignor and agrees to indemnify the Assignee for any claims arising out of the Management Agreement which arise from facts prior to the effective date of this Assignment. Assignee agrees to assume all the rights and obligations of Assignor under the Management Agreement and agrees to indemnify the Assignor for any claims arising out of the Management Agreement after the effective date of this Assignment.

4. All notices under this Agreement
   shall be sent to:          Assignee:     522 W. 38th St. NY LLC
                                            147-25 Northern Blvd., Suite 3E
                                            Flushing, New York 11354

                              Assignor:     Unigroup Hotel LLC
                                            54 Canal Street, 3rd Flr.
                                            New York, NY 10002

   and, if applicable,

                              Manager:      Crossroad Hospitality Management
                                            Company
                                            c/o Interstate Hotels Corporation
                                            Foster plaza Ten
                                            680 Andersen Drive
                                            Pittsburgh, PA 15220

5. Assignor represents to Assignee that Manager is not in default under any of the terms of the Management Agreement; no break in manager's service has occurred; the Management Agreement is in full force and effect, and Assigns is current as to all obligations, accrued or otherwise, under the Management Agreement as of the date hereof.

6. All other terms and conditions of the original Management Agreement shall remain in full force and effect and binding on all parties.

7. Assignor acknowledges that Assignee and Manager are modifying the Management Agreement as of the date hereof, and said modification shall not change Assignor's indemnity to Assignee herein.

Dated this 7th of February 2005

ASSIGNOR:  Unigroup Hotel LLC          ASSIGNEE:    522 W. 38th ST. NY LLC

By:                                    By:
Kin Chung Lam                          Show Lan C. Cheng

Its Managing Member                    Its Managing Member

# MANAGEMENT

# AGREEMENT
(Best Western)
(West 38th Street, New York, NY )


between


UNIGROUP HOTEL LLC


and


CROSSROADS HOSPITALITY MANAGEMENT COMPANY


June 6, 2001

G:\HOTELS\CROSSRDS\NEWYORK\BESTWESTERN\MGMTAGMT.1PL.DOC

## MANAGEMENT AGREEMENT

This Management Agreement ("Agreement") is made this 6th day of June, 2001, by and between UNIGROUP HOTEL LLC, a New York limited liability company, whose principal place of business is 54 Canal Street, Third Floor, New York, New York 10002 (hereinafter referred to as "Owner"), and CROSSROADS HOSPITALITY MANAGEMENT COMPANY, a Delaware corporation, whose principal place of business is Foster Plaza Ten, 680 Andersen Drive, Pittsburgh, Pennsylvania 15220 (hereinafter referred to as "Manager").

### RECITATIONS

WHEREAS, Owner is the owner of certain land located at 522 West 38th Street, New York, New York 10001 (the "Land") described in Exhibit A attached hereto, upon which is to be constructed a hotel known as the Best Western Hotel (the "Hotel");

WHEREAS, subject to the terms and provisions of this Agreement, Owner desires to have Manager assist Owner in managing and operating the hotel; and

WHEREAS, Manager is willing to perform such services as agent of and for the account of the Owner in accordance with the terms hereof.

NOW THEREFORE, in consideration of the foregoing recitals and the premises and the mutual covenants herein contained, the parties hereto agree as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

Section 1.1  Accounting Period shall mean each of twelve (12) accounting periods of one (1) calendar month occurring each fiscal year.

Section 1.2  Base Management Fee. The term Base Management Fee as used in this Agreement shall have the meaning set forth in Section 9.1 hereof.

Section 1.3  Fiscal Year. The term Fiscal Year shall mean a Calendar Fiscal Year starting on January 1 and ending on December 31  or portion thereof depending upon the Management Commencement Date  (as defined in Section 1.8) and the termination of this Agreement (as described in Article XI).

Section 1.4  Gross Operating Revenues. The term Gross Operating Revenues as used in this Agreement shall mean all receipts, revenues, income and proceeds of sales of every

kind received by Manager directly or indirectly from the operation of the Hotel. Gross Operating Revenues shall exclude all sales and excise taxes and any similar taxes collected as direct taxes payable to taxing authorities; gratuities or service charges collected for payment to and paid to employees; credit or refunds to guests; proceeds of insurance, save and except for proceeds of insurance with respect to use and occupancy or business interruption insurance; lease revenues collected from the leased lounge operation; and proceeds of condemnation.

Section 1.5  Gross Operating Profit. The term Gross Operating Profit as used in this Agreement shall mean the excess, during each Fiscal Year (and proportionately for any period less than a Fiscal Year), of Gross Operating Revenues over expenses and deductions incurred in the operation of the Hotel by Manager in fulfilling its duties hereunder during such period, determined in accordance with the accounting system established by the Uniform System (except as modified by this Agreement). In arriving at Gross Operating Profit, all expenses shall be proper deductions from Gross Operating Revenues insofar as they relate to the operation of the Hotel including all license fees, and out-of-pocket expenses of employees of Manager or its affiliates such as travel costs, fax, postage, telephone and express mail; provided, however, in arriving at Gross Operating Profit, there shall be no deduction for any of the following fixed charges: property taxes, expenses associated with the Asset Manager and directly related to the Hotel, insurance, capital leases, reserve for replacements and debt service payments. Manager shall not charge hotel for any other out-of-pocket costs, except for unusual or extraordinary items due to a special request from the Owner.

Section 1.6  Incentive Fee. The term Incentive Fee as used in this Agreement shall have the meaning set forth in Section 9.2 hereof.

Section 1.7  Management Commencement Date. The term Management Commencement Date as used in this Agreement shall mean the date Manager assumes management of the Hotel in accordance with the provisions of this Agreement.

Section 1.8  Operating Funds. The term Operating Funds as used in this Agreement shall have the meaning set forth in Section 6.2 hereof.

Section 1.9  Uniform System. The term Uniform System as used in this Agreement shall mean the Uniform System of Accounts for Hotels, "Ninth Revised Edition", 1996, as revised and adopted by the Hotel Association of New York City, Inc., from time to time and as modified by applicable provisions of this Agreement.

Other terms are defined in the Recitations and the further provisions of this Agreement, and shall have the respective meanings there ascribed to them.

## ARTICLE II

### ENGAGEMENT OF MANAGER AND
### COMMENCEMENT OF MANAGEMENT OF THE HOTEL

Section 2.1   Engagement of Manager to Manage Hotel.   Owner hereby appoints Manager as Owner's exclusive agent, subject to the terms of this Agreement, to supervise, direct and control the management and operation of the Hotel, and Manager hereby undertakes and agrees to perform, as the agent of and for the account of Owner, all of the services and to comply with all of the provisions of this Agreement, upon all of the terms and conditions hereinafter set forth.

Section 2.2   Management Commencement Date and Pre-Commencement Activities.

A.   Manager shall assume management and operation of the Hotel upon the date the Hotel opens for business, which is expected to be on or about October 1, 2001 (the "Management Commencement Date").

## ARTICLE III

### OPERATION OF THE HOTEL
### AFTER THE MANAGEMENT COMMENCEMENT DATE

Section 3.1   Authority of Manager.   On and after the Management Commencement Date, the Manager shall have the exclusive authority and duty to direct, supervise, manage and operate the Hotel in an efficient and economical manner and to determine the programs and policies to be followed in connection therewith, all in accordance with the provisions of this Agreement and the Annual Business Plan.   Subject to the provisions of this Agreement, Manager shall have the discretion and absolute control in all matters relating to the management and operation of the Hotel.   Without limiting the generality of the foregoing, Manager shall have the authority and duty to:

A.   Recruit, employ, relocate, pay, supervise, and discharge all employees and personnel necessary for the operation of the Hotel.   Included in the foregoing shall be the determination of all personnel policies.   Owner has the right to approve the hiring and termination of the Hotel's General Manager, which approval shall not be unreasonably withheld or delayed.

B.   Establish all prices, price schedules, rates and rate schedules, rents, lease charges, and concession charges.

C.   Administer leases, license and concession agreements for all public space at the Hotel, including all stores, office space and lobby space.   All such leases,

licenses or concessions shall be in Owner's name and may be executed by Manager on Owner's behalf.

D.    Negotiate and enter into, on behalf of the Owner, service contracts and licenses required in the ordinary course of business in operating the Hotel provided, however, any contract for a term in excess of one (1) year shall be approved by Owner, which approval shall not be unreasonably withheld or delayed.

Section 3.2  Employees. Manager shall be the employer of all employees in the Hotel. Manager shall have no authority to enter into a collective bargaining agreement for the Hotel without the express written approval of Owner.  Owner's and Manager's agents and employees, but excluding any affiliates of Manager who provide consulting services to Manager in connection with the Hotel, shall be acting as the agent of the Owner.  Manager shall have complete authority over pay scales and benefit plans, subject to Owner's approval of the Annual Business Plan.

## ARTICLE IV

## OPERATING EXPENSES PAID BY OWNER

Section 4.1  Expenses Incurred by Manager on Behalf of Owner. Everything done by Manager in the performance of its obligations and all expenses incurred under this Agreement shall be for and on behalf of Owner and for its account.  All debts and liabilities arising in the course of business of the Hotel are and shall be the obligations of Owner, and Manager shall not be liable for any of such obligations by reason of its management, supervision and operation of the Hotel for Owner.  Unless expressly stated herein, neither Manager nor any of its Affiliates shall be obligated to advance any of its own funds to or for the account of Owner, nor to incur any liability unless Owner shall have furnished Manager with funds necessary for the discharge thereof prior to incurring such liability.

## ARTICLE V

## COMPLIANCE WITH LAWS

Section 5.1  Compliance by Manager and Owner After Management Commencement Date. Manager shall make all reasonable efforts, at expense of Owner, to comply with all laws, rules, regulations, requirements, orders, notices, determinations and ordinances of any governing authority, including, without limitation, the state and local authorities, the Board of Fire Underwriters and the requirements of any insurance companies covering any of the risks against which the Hotel is insured.  If the cost of compliance exceeds ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in any instance, Manager shall promptly notify Owner, and Owner shall promptly provide Manager with funds for the payment of such costs.

**Section 5.2    Owner's Right to Contest or Postpone Compliance.** With respect to a violation of any such laws or rules, the Owner shall have the right to contest any of the foregoing and postpone compliance pending the determination of such contest, if so permitted by law and not detrimental to the operation of the Hotel, but in such event, Owner shall indemnify and hold harmless Manager from any loss, cost, damage or expense, as a result thereof.

**Section 5.3    Manager's Right to Terminate Agreement.** Notwithstanding anything in this Agreement to the contrary, if within thirty (30) days of receiving Management Company's written request Owner fails to approve the changes, repairs, alterations, improvements, renewals or replacements to the Hotel which Management Company determines in its reasonable judgment are necessary to  (i) protect the Hotel, Owner and/or Management Company from innkeeper liability exposure; or  (ii) ensure material compliance with any applicable code requirements pertaining to life safety systems requirements; or (iii) ensure material compliance with any application state, local, or federal employment law, including, without limitation, the Americans with Disabilities Act, then Management Company may, notwithstanding the provisions of Section 11.4, terminate this Agreement any time after such thirty (30) day period upon seven (7) days' written notice.

## ARTICLE VI

## AGENCY ACCOUNT, OPERATING FUNDS, AND RESERVE FUND ACCOUNT

**Section 6.1    Agency Account.** All monies received by Manager in the operation of the Hotel, including the Operating Funds furnished by Owner, shall be deposited in accounts, (collectively called the "Agency Account") in Manager's name, as agent of Owner, in the bank or trust company recommended by Manager and approved by Owner. Such monies shall not be mingled with Manager's other funds. Out of the Agency Account, Manager shall pay all operating expenses of the Hotel, any fees or compensation of any kind due it pursuant to this Agreement and the pre-opening agreement of even date herewith between Owner and Manager (the "Pre-Opening Agreement"), in accordance with the provisions of this Agreement. Withdrawals from accounts established pursuant to this Article VI shall be signed by representatives of the Manager only, provided such representatives are bonded or otherwise insured.

**Section 6.2    Operating Funds.** As noted in the Pre-Opening Agreement, and thereafter, from time to time if and as required, Owner shall maintain cash in the Hotel accounts ("Operating Funds") sufficient in amount to properly operate the Hotel. If at any time during the initial Term and any Renewal Terms of this Agreement, the Operating Funds on hand fall below ███████ (the "Minimum Balance"), Owner shall deposit in the Agency Account additional funds in an amount equal to the difference between the Operating Funds then on hand and the Minimum Balance.

Section 6.3 <u>Initial Cash Flow Expenses</u>. During the initial ninety (90) days during the Initial Term ("Initial Start-Up Operations Period"), Manager anticipates potential negative cash flow as part of the expense of initial operations of the Hotel. In addition to the Minimum Balance, no later than five (5) days prior to the Management Commencement Date, Owner agrees to deposit into the Agency Account an additional amount of ███████ ███████ ("Surplus Start-Up Working Funds") to provide sufficient working capital during the initial operations of the Hotel. To the extent that Manager reasonably concludes that any excess Surplus Start-Up Working Funds exist and will not be needed to cover future negative cash flow, Manager shall return to Owner such excess Surplus Start-Up Working Funds at the conclusion of the Initial Start-Up Operations Period.

<u>ARTICLE VII</u>

BOOKS, RECORDS AND FINANCIAL STATEMENTS

Section 7.1 <u>Accounting System</u>. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel on an accrual basis, all substantially in accordance with the Uniform System. Manager may perform accounting services at Manager's affiliate's corporate office or at the Hotel. Manager reserves the right to contract, at Owner's expense, with a qualified independent third party for payroll and other services to the extent that such a contract would be cost justified. Except for such books and records as Manager may elect to keep in its affiliate's corporate office or other suitable location pursuant to the operation of centralized accounting services, Manager shall keep the books of account and all other records relating to, or reflecting the operation of, the Hotel at the Hotel and shall be available to Owner and its representatives at all reasonable times for examination, audit, inspection and transcription. All of such books and records, including, without limitation, books of accounts, guest records and front office records, at all times shall be the property of Owner. Upon termination of this Agreement, all the books and records shall be turned over to Owner to ensure the orderly continuation of the operation of the Hotel, but the books and records shall thereafter be available to the Manager at all reasonable times for inspection, audit, examination and transcription.

Section 7.2 <u>Financial Statements</u>. Manager shall deliver to Owner within twenty (20) days after the end of each Accounting Period and within sixty (60) days after the end of each fiscal year the following:

A. Profit & Loss Statement by Department with Month-End and Year-to-Date Actual and Budget
B. Balance Sheet
C. Variance Analysis
D. Forecast
E. Reserve Fund/Capital Update
F. Cash Flow Statement

Any disputes as to the contents of any such statements or any accounting matter hereunder, shall be determined by the independent auditor mutually agreed upon by Owner and Manager (the "Independent Auditor") whose decision shall be final and conclusive on Manager and Owner.

## ARTICLE VIII

### ANNUAL BUSINESS PLAN

Section 8.1    Preparation of Annual Business Plan.    At least forty-five (45) days prior to the end of each Fiscal Year, Manager shall submit an Annual Business Plan for the succeeding Fiscal Year. The Annual Business Plan shall include: an operating budget showing estimated Gross Operating Revenues, department profits, operating expenses, and Gross Operating Profit for the forthcoming Fiscal Year for the Hotel; a marketing plan; a cash flow forecast; the budget for replacing Furniture, Fixtures, and Equipment and for making capital improvements; all in reasonable detail and, where appropriate, with the basis for all assumptions expressly set forth.  Owner shall review the Annual Business Plan and either approve or notify Manager of any objections to the Annual Business Plan in writing within ten (10) days of its receipt thereof. Owner's approval of the Annual Business Plan shall not be unreasonably withheld or delayed.

Section 8.2    Annual Business Plan Disputes.    If Manager and Owner are unable to agree upon an Annual Business Plan or any details thereof, Manager shall operate the Hotel in accordance with the prior fiscal year's Annual Business Plan, with the expenses provided therein increased by ████████████████ until a new Annual Business Plan is agreed to.

Section 8.3    Deviations from Annual Business Plan.    Manager shall diligently pursue all feasible measures to enable the Hotel to adhere to the Annual Business Plan. Notwithstanding anything herein to the contrary, Manager is not warranting or guaranteeing in any respect that the actual operating results of the Hotel during the period covered by the Annual Business Plan will not materially vary from the projections described in the Annual Business Plan.  However, the Manager will provide explanations for all significant variances and programs put in place to correct or improve situations which deviate from the original plan.

## ARTICLE IX

### MANAGER'S FEES AND REIMBURSEMENTS

Section 9.1    Base Management Fee.    Commencing with the Management Commencement Date, during the remaining months of Fiscal Year 2001 and all of Fiscal Year 2002, in consideration of the services Manager is to render under this Agreement, Manager will be paid a fee ("Base Management Fee") in an amount equal ██████████████ of Gross Operating Revenues per Accounting Period.  Commencing with Fiscal Year 2003 (and for a

fraction of any Fiscal Year) for the remainder of the Initial Term and any Renewal Term, Manager will be paid an amount equal to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of Gross Operating Revenues per Accounting Period. The Base Management Fee will be paid immediately following each Accounting Period. At the end of each Fiscal Year, an adjustment will be made, if necessary, and all sums due either the Manager or Owner shall be paid immediately.

Section 9.2  Incentive Fee.  In addition to the Base Management Fee, during each Fiscal Year (and for any partial Fiscal Year) in which Manager is to render services under this Agreement, Manager will be paid an incentive fee ("Incentive Fee") equal to ▓▓▓▓▓▓▓ of the Gross Operating Profit in excess of ▓▓▓▓▓▓▓▓▓ The Incentive Fee will be payable in installments by Manager immediately following each Accounting Period. At the end of each Fiscal Year, an adjustment will be made, if necessary, and all sums due either Manager or Owner shall be paid immediately.

Section 9.3  Total Fees Earned.  Notwithstanding the provisions of Sections 9.1 and 9.2, the combined Base Management Fee and Incentive Fee earned by Manager shall not exceed ▓▓▓▓▓▓▓▓▓▓▓ of annual Gross Operating Revenues.

Section 9.4  Accounting Fee.  In addition to the Base Management Fee and the Incentive Fee, the Manager shall be paid a fee for centralized accounting services (the "Accounting Fee") equal to ▓▓▓▓▓▓▓ Accounting Period during the Term of this Agreement and for one (1) Accounting Period after the termination of this Agreement. The Accounting Fee shall be increased each year in accordance with increases in the Consumer Price Index-Cities-All Urban Consumers (1982-84 = 100)", issued by the Bureau of Labor Statistics of the United States Department of Labor.

Manager agrees to provide Owner the option of having Manager provide centralized accounting services from the Holiday Inn Philadelphia Airport Hotel, which is owned by Owner or an affiliate of Owner, as long as Owner and Manager jointly agree upon the hardware and software systems to be utilized at the Holiday Inn Philadelphia Airport Hotel for these services. An appropriate charge for these services that would be provided at the Holiday Inn Philadelphia Airport would be assessed monthly to the Best Western Hotel.

Should the contract be terminated, there will be either one additional month's centralized accounting fee assessed to complete all final financial responsibilities for the Hotel or one monthly accounting assessment from the Holiday Inn Philadelphia Airport Hotel.

ARTICLE X

INSURANCE

Section 10.1  Insurance Coverage.  Owner, or Manager at the direction of Owner, shall provide and maintain, at Owner's cost and expense, insurance sufficient to furnish to Owner

and Manager reasonable and adequate protection in the management and operation of the hotel. Such insurance shall provide coverage for comprehensive general liability, automobile, garagekeepers liability, excess/umbrella liability, property insurance and boiler & machinery, all as more particularly set forth on the attached Exhibit B. All insurance shall be in the name of Owner and Manager as the insureds and shall contain riders and endorsements adequately protecting the interests of Manager as it may appear including, without limitation, provisions for at least twenty (20) days' notice to Manager of cancellation or of any material change therein. Prior to the Management Commencement Date and the commencement of each Fiscal Year thereafter, Owner shall furnish Manager with certificates evidencing the insurance coverages required pursuant to Exhibit B and with evidence of the payment of premiums therefor. Owner agrees that it will utilize Manager's insurance program to satisfy the requirements of this Section 10.1 unless Owner can obtain more comprehensive coverages at a better price and on more advantageous terms. It shall be the Manager's obligation as the employer, at the Owner's expense, to obtain Workers Compensation, Crime/Fidelity Bond, and Employment Practices coverages as set forth on Exhibit B. If Owner becomes the employer, this obligation shall become the responsibility of the Owner, at its own expense.

Section 10.2 Waiver of Subrogation - Owner Assumes Risk of Adequacy. Owner shall have all policies of insurance provide that the insurance company will have no right of subrogation against either party hereto, their agents or employees. Owner assumes all risks in connection with the adequacy of any insurance or self-insurance program, and subject to the provisions of Article XV hereof, waives any claim against Manager for any liability, costs or expenses arising out of any uninsured claim, in part or in full, of any nature whatsoever.

## ARTICLE XI

## TERM OF AGREEMENT AND TERMINATION

Section 11.1 Term. This Agreement shall be for a period commencing on the date hereof and unless sooner terminated as hereinafter provided, shall continue until the end of the Fiscal Year in which the fifth (5th) annual anniversary of the Management Commencement Date occurs (the "Initial Term"). Thereafter, this Agreement shall automatically renew for consecutive sixty (60) day renewal terms ("Renewal Terms") unless either party provides to the other notice of termination at least sixty (60) days prior to the end of the then current term. Any reference in this Agreement to "Term" shall be deemed to be a reference to the Initial Term and any Renewal Term.

Section 11.2 Early Termination. This Agreement can be terminated earlier as described below. Upon termination the rights and obligations of the parties will cease except as to fees and reimbursements due the Manager and other claims of liabilities of either party which accrued or arose before termination.

A.  Either Party can terminate this Agreement if:

  (i)  the Hotel is damaged or destroyed by a casualty and the damaged portion of the Hotel cannot be reasonably repaired or restored within one (1) year of the occurrence of the event;

  (ii)  the entire Hotel is taken in a condemnation proceeding or a portion of the Hotel is taken such that either party determines in its reasonable judgment that the Hotel cannot be operated at levels substantially like those experienced prior to the condemnation; or,

  (iii)  the other party shall:  apply for or consent to the appointment of a receiver, trustee or liquidator of such party or of all or a substantial part of its assets; file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they come due; make a general assignment for the benefit of creditors; file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law or file an answer admitting the material allegations of a petition filed against it in any bankruptcy, reorganization or insolvency proceedings; or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating it a bankrupt or insolvent or approving a petition seeking reorganization of it or appointing a receiver, trustee or liquidator of it or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days; or

  (iv)  Between January 1, 2003 and January 31, 2003, Owner and Manager each shall have the right to terminate this Agreement by giving sixty (60) days prior written notice of termination to the other party.  If Owner terminates this Agreement, the Owner shall pay Manager the waived Pre-Opening Fee of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (as described in the Pre-Opening Agreement).

B.  The Owner can terminate this Agreement if:  Manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement and such default shall continue for a period of thirty (30) days after notice thereof by Owner to Manager, unless it is impossible for such breach of non-compliance to be remedied or corrected within such time due to no fault of Manager in which event, Manager shall remedy or correct such breach of non-compliance as soon as reasonably possible but in any event no later than ninety (90) days after such written notice unless the cure or remedy for such breach or non-compliance requires construction, in which event, Owner shall proceed with such construction as expeditiously as possible and shall have a reasonable period of time to complete such work.

C.  <u>The Manager can terminate at any time if</u>:

   (i)     Owner fails to pay any amounts due to Manager;

   (ii)    the Owner fails to furnish required Operating Funds in accordance with the provisions of the Pre-Opening Agreement and <u>Article VI</u> hereof;

   (iii)   Owner fails to make any other payment in accordance with the terms hereof when such payment is due and payable;

   (iv)    there is a default under the terms and conditions of any security instruments executed in connection with Hotel;

   (v)     Owner fails to provide and maintain the insurance policies called for in <u>Article X</u>;

   (vi)    any license or permit necessary for the operation of the Hotel is not issued on the Management Commencement Date and thereafter maintained throughout the term of this Agreement; or

   (vii)   there is a breach of, or non-compliance by the Owner with any other term, condition or covenant contained in this Agreement followed by written notice from Manager to the Owner and failure of the Owner to remedy or correct same within thirty (30) days after receipt of such notice, unless it is impossible for such breach of non-compliance to be remedied or corrected within such time due to no fault of Owner, in which event, Owner shall remedy or correct such breach of non-compliance as soon as reasonably possible but in any event no later than ninety (90) days after such written notice unless the cure or remedy for such breach or non-compliance requires construction, in which event, Owner shall proceed with such construction as expeditiously as possible and shall have a reasonable period of time to complete such work; or

   (viii)  the Management Commencement Date does not occur on or before March 31, 2002.

   Section 11.3  <u>Remedies on Default</u>.  Notwithstanding the other provisions of this <u>Article XI</u>, the party asserting a default hereunder may, without prejudicing its rights to terminate this Agreement pursuant to this <u>Article XI</u>, seek arbitration in accordance with the provisions of <u>Section 16.6</u> hereof, or any other legal or equitable remedy.

Section 11.4. Termination Procedure.

A.    If a termination occurs pursuant to Section 11.2(A) or Section 11.2(B), the party electing to terminate shall give the other party written notice of such election. On the date which is ten (10) days after the date of such notice, Manager shall cease all activities at the Hotel and shall have no further obligations under this Agreement.

B.    If a termination occurs pursuant to Section 11.2(C), Manager shall give to Owner notice of such election. Any time thereafter, Manager may, on ten (10) days' written notice, cease all activities at the Hotel and thereafter have no further obligations under this Agreement.

C.    After the notice is given, and prior to the date Manager ceases activities at the Hotel, Manager shall be paid any and all fees or expenses due it pursuant to this Agreement, and Manager shall cooperate with Owner in the orderly transfer of management to Owner or Owner's designated agent.

D.    Upon notice, a deposit will be made by Owner of ▇▇▇▇▇ to cover subsequent expenses which must be made by the Manager to terminate activities of the Hotel. A budget will be prepared for Owner's approval and an accounting will be made of these monies and surpluses will be sent to Owner. Any deficits will be funded by Owner.

## ARTICLE XII

## OWNER'S REPRESENTATIONS AND COVENANTS

Section 12.1 Owner's Representations.  Owner covenants, represents and warrants as follows:

A.    The Owner is the owner of the Hotel and has full power and authority to enter into this Agreement;

B.    The Hotel will be zoned for use as a hotel, motor hotel or resort, and all necessary governmental and other permits and approvals for such use and operations of the Hotel will be obtained and remain in full force and effect; and

C.    Throughout the term of this Agreement, the Owner will pay, keep, observe and perform all payments, terms, covenants, conditions and obligations under any lease or other concession, any deed of trust, mortgage or other security agreement, and any real estate taxes or assessments covering or affecting the Hotel.

## ARTICLE XIII

## ASSIGNMENT

Section 13.1    Assignment.    Neither party shall assign or transfer or permit the assignment or transfer of this Agreement without the prior written consent of the other; provided, however, that Manager shall have the right, without such consent, to irrevocably and totally assign its interest in this Agreement to any of its Affiliates or to an entity under the control of then current senior executives of Interstate Hotels Corporation, an Affiliate of Manager. Nothing contained herein shall prevent the transfer of this Agreement in connection with a merger or consolidation of substantially all of the assets of either party or their respective Affiliates.    In the event of consent by either party to an assignment of this Agreement by the other, no further assignment shall be made without the express consent in writing of such party, unless such assignment may otherwise be made without such consent pursuant to the terms of this Agreement.    Owner may sell the Hotel and assign this Agreement to the new owner without paying any termination fee if Manager approves the new owner as being financially sound and having a good moral standing, and such new owner assumes all of the obligations hereunder in a written instrument acceptable to Manager.    An assignment by either Owner or Manager of its interest in this Agreement shall not relieve Owner or Manager, as the case may be, from their respective obligations hereunder unless the assignee accepts full responsibility for performance of the same.

## ARTICLE XIV

## TAXES

Section 14.1    Real Estate and Property Taxes.    All real estate and ad valorem property taxes, assessments and similar charges on or relating to the Hotel during the term of this Agreement shall be paid by Owner before any fine, penalty or interest is added thereto or lien placed upon the Hotel or this Agreement, unless payment thereof is, in good faith, being contested and enforcement thereof is stayed.    Owner shall, within the earlier of thirty (30) days of payment or ten (10) days following written demand by Manager, furnish Manager with copies of official tax bills, assessments and evidence of payment or contest thereof.    Manager's responsibilities specifically exclude the preparation, filing or contesting of these taxes.

## ARTICLE XV

## INDEMNIFICATION AND LIMITATION OF LIABILITY

Section 15.1    Indemnification and Limitation of Liability.    Owner shall hold harmless, indemnify and defend Manager and its Affiliates and their respective agents, employees, officers, directors and shareholders from and against all expenses incurred by Manager or its Affiliates which, in Manager's sole judgment, were or are necessary or desirable for the

operation of the Hotel, and all claims (administrative or judicial), damages, losses and expenses (including, but not limited to, attorneys' fees for pre-trial, trial and appellate proceedings, accounting fees, appraisal fees and consulting and expert witness fees) arising out of or resulting from Manager's activities performed pursuant to this Agreement, any franchise agreement, any past or future building code or life/safety code violations, and injury to person(s) and damage to property or business by reason of any cause whatsoever in and about the Hotel or elsewhere, and any requirement or award relating to course of employment, working conditions, wages and/or compensation of employees or former employees at the Hotel, unless any such injury or damage is caused by gross negligence, willful misconduct, or fraud on the part of Manager, its agents, employees, or representatives. Any indemnification shall apply regardless of whether or not said claim, damage, loss or expense is covered by insurance as herein provided.

Section 15.2 Manager's Indemnification. Manager shall hold harmless, indemnify and defend Owner and its Affiliates, and their respective agents, employees, officers, directors and shareholders, from and against all claims, damages, losses and expenses (including, but not limited to, attorneys' fees for pre-trial, trial and appellate proceedings) arising out of or resulting from Manager's gross negligence, willful misconduct or fraud.

Section 15.3 Indemnification Procedure. Upon the occurrence of an event giving rise to indemnification, the party seeking indemnification shall notify the other party hereto and provide the other party hereto with copies of any documents reflecting the claim, damage, loss or expense. The party seeking indemnification is entitled to engage such attorneys and other persons to defend against the claim, damage, loss or expense, as it may choose. The party providing indemnification shall pay the reasonable charges and expenses of such attorneys and other persons on a current basis within twenty (20) days of submission of invoices or bills. In the event Owner neglects or refuses to pay such charges, Manager may pay such charges out of the Agency Account and deduct such charges from any amounts due Owner or add such charges to any amounts due Manager from Owner. If any claim, lawsuit or action (administrative or judicial) is maintained against Manager, Owner or the Hotel due to allegations or actions arising prior to the Term, Owner shall bear full and complete responsibility for the defense of the Hotel, the Owner, the Manager, specifically including all legal fees and necessary and attendant expenses for the vigorous defense and representation of the interests of the Manager (for pre-trial, trial and appellate proceedings), the Hotel and the Owner. Owner shall support and pay for all legal fees and representations necessary to remove Manager from any claim, action (administrative or judicial), or lawsuit covered by this provision.

Section 15.4 No Successor Liability. Notwithstanding anything herein to the contrary, neither Manager nor its affiliates shall be liable as a successor employer or entity for any actions Owner or Owner's predecessors may have taken in the employer-employee relationship with Owner's current or former employees or employees of Owner's agents before the commencement of the Term. Specifically, Manager shall not be liable or responsible in any manner for, and Owner shall indemnify and hold Manager harmless from, pending claims, lawsuits, actions (administrative or judicial), or unasserted claims arising out

of Owner's or Owner's predecessors' ownership, operation, or employment of employees of the Hotel.

## ARTICLE XVI

## MISCELLANEOUS

Section 16.1 Severability. In the event that any portion of this Agreement shall be declared invalid by order, decree or judgment of a court, this Agreement shall be construed as if such portion had not been inserted herein except when such construction would operate as an undue hardship to Manager or Owner or constitute a substantial deviation from the general intent and purpose of said parties as reflected in this Agreement.

The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement or to exercise any option, right or remedy herein contained, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

Section 16.2 Agency. The relationship of Owner and Manager shall be that of principal and agent. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between them or their successors in interest. Neither party shall borrow money in the name of, or pledge the credit of, the other. Manager's agency established by this Agreement is coupled with an interest and may not be terminated by Owner except in accordance with the terms hereof.

Section 16.3 Consents. Except as herein otherwise provided, whenever in this Agreement the consent or approval of Owner or Manager is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall be in writing only and shall be duly executed by an authorized officer or agent of the party granting such consent or approval.

Section 16.4 Applicable Law. This Agreement shall be construed under, and governed in accordance with, the laws of the State of New York.

Section 16.5 Successors Bound. This Agreement shall be binding upon and inure to the benefit of Owner, its successors and assigns, and shall be binding and inure to the benefit of Manager and its permitted assigns.

Section 16.6 Arbitration. In the event a dispute should arise concerning the interpretation or application of any of the provisions of this Agreement, the parties agree the dispute shall be submitted to arbitration of the American Arbitration Association, except as modified by this Section 16.6. The Arbitration Tribunal shall be formed of three (3) Arbitrators each of which shall have at least five (5) years' experience in hotel operation, management

or ownership, one (1) to be appointed by each party and the third (3rd) to be appointed by the American Arbitration Association. The arbitration shall take place in New York, New York, and shall be conducted in the English language. The arbitration award shall be final and binding upon the parties hereto and subject to no appeal, and shall deal with the question of costs of arbitration and all matters related thereto. Arbitration expenses shall not be an expense in determining Gross Operating Profit. Judgment upon the award rendered may be entered into any court having jurisdiction, or applications may be made to such court for an order of enforcement.

Section 16.7 <u>Incorporation of Recitals</u>. The recitals set forth in the preamble of this Agreement are hereby incorporated into this Agreement as if fully set forth herein.

Section 16.8   <u>Force Majeure</u>. If act of God, acts of war, acts of terrorism, civil disturbance, labor strikes, governmental action, including the revocation of any license or permit necessary for the operation contemplated in this Agreement where such revocation is not due to Manager's fault, or any other causes beyond the control of Manager shall, in Manager's reasonable opinion, have a significant adverse effect upon the operations of the Hotel, then Manager shall be entitled to terminate this Agreement upon sixty (60) days' written notice from the date of such event.

Section 16.9 <u>Notices</u>. Notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against receipt or sent by certified or registered mail or by Federal Express or other similar overnight mail service, return receipt requested:

<u>To Owner</u>:                                              with copy to:

████████████████
████████████████
Phone: ████████████
Fax: ████████

<u>To Manager</u>:                                          with copy to:
Crossroads Hospitality
Management Company
c/o   Interstate Hotels Corporation          Interstate Hotels Corporation
      Foster Plaza Ten                       Foster Plaza Ten
      680 Andersen Drive                     680 Andersen Drive
      Pittsburgh, PA  15220                  Pittsburgh, PA  15220
Attn:  President & Chief                     Attn: General Counsel
       Operating Officer
Phone 412-937-0600                           Phone 412-937-0600
Fax    412-937-0655                          Fax    412-937-3263

or at such other address as from time to time designated by the party receiving the notice.

Section 16.10 <u>Entire Agreement</u>. This Agreement, together with other writings signed by the parties expressly stated to be supplementing hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a writing signed by the parties hereto.

Section 16.11 <u>Time</u>. Time is of the essence with respect to this Agreement.

Section 16.12 <u>Attorneys' Fees</u>. In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to reasonable costs and expenses, including without limitation, attorneys' fees.

Section 16.13 <u>Use of Hotel Guest Rooms by Corporate Staff or Employees</u>. At any time Manager or its affiliates are doing business for the Hotel, and are using the Hotel's guest rooms for this purpose, then those rooms will be complimentary. At any time Manager, its affiliates or employees wish to use the Hotel's guest rooms for non-related business of the Hotel, then those individuals will be charged the posted Corporate Rate as defined within the Annual Business Plan.

Section 16.14 <u>Task Force</u>. Commencing ninety (90) days after the Management Commencement Date, Manager agrees that it will not, without Owner's approval, utilize any of the Hotel's staff for task-force services at other Hotels operated by Manager or its affiliates and will also not place any task-force personnel at the Hotel if the expense associated with such task-force individual is outside of the agreed-upon Annual Business Plan.

Section 16.15 <u>Lounge Operation</u>. Manager acknowledges that Owner will lease the Hotel's lounge operation to a third-party lessee. Because the lounge operation is an integral part of the Hotel's operations, Manager reserves the right to approve the lounge operator and its standards of operations.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

ATTEST:

OWNER:
UNIGROUP HOTEL LLC

By: _____
Name: KW CHWA LAM
Title: MEMBER

ATTEST:

MANAGER:
CROSSROADS HOSPITALITY
MANAGEMENT COMPANY

By: _____
Name: _TIMOTHY A. BREED_
Title: _VP FINANCE_

Exhibit A

The Land
(to be provided by Owner)

**ihr**

Interstate
Hotels & Resorts

February 3, 2005

Unigroup Hotel, LLC
c/o Leon Luk
Luk and Luk, LLP
254 Canal Street #2001
New York, NY 10013

522 W.38th St. NY LLC
c/o Robert A. Rubenfeld, Esq.
Todtman, Nachamie, Spizz & Johns, P.C.
425 Park Ave.
New York, New York 10022
Phone: (212) 754-9400 x-403
Fax: (212) 754-6262

    Re:    Management Agreement between Unigroup Hotel, LLC ("Assignor") and Crossroads Hospitality Management Company ("Manager"), dated June 6, 2001 (the "Management Agreement") for the management of the Best Western Hotel located at 522 West 38th Street, NY, NY.

Dear Mssrs. Rubenfeld and Luk:

    We hereby consent to the assignment of the Management Agreement from Assignor to Assignee pursuant to the Assumption and Modification of Management Agreement signed as of January 31, 2005 between Manager and Assignee.

    Sincerely,

*Alicia Kabin*

Alicia Kabiri
VP, Assistant General Counsel

## ASSUMPTION AND MODIFICATION OF MANAGEMENT AGREEMENT

THIS ASSUMPTION AND MODIFICATION OF MANAGEMENT AGREEMENT, dated as of January 31, 2005 (this "Amendment") is made by and between CROSSROADS HOSPITALITY MANAGEMENT COMPANY, LLC, a Delaware Limited Liability company and subsidiary of Interstate Hotels & Resorts, Inc., ("Manager"), and 522 W.38th St. NY LLC, a New York limited liability company ("Assignee").

### WITNESSETH:

WHEREAS, Unigroup Hotel, LLC ("Assignor") and Manager entered into a Hotel Management Agreement dated June 6, 2001 (the "Management Agreement") for the management of the Best Western Hotel located at 522 West 38th Street, NY, NY ("Hotel");

WHEREAS, Assignor and Assignee have executed a Purchase and Sale Agreement pursuant to which Assignee is taking title to the Hotel on or about January 31, 2005 ("Closing Date");

WHEREAS, Assignee desires to assume Assignor's obligations, responsibilities and liabilities under the Management Agreement, as amended herein; and

WHEREAS, Manager and Assignee have agreed to some modifications of the Management Agreement,

NOW, THEREFORE, the parties hereto agree as follows:

1. Assignee does hereby accept the foregoing assignment and does hereby assume, agree to perform and be bound by all of the covenants, conditions, obligations and liabilities, hereafter accruing from Closing Date, of Assignor under the Management Agreement.

2. Manager hereby agrees to the above assignment of the Management Agreement and does hereby release Assignor from any and all obligations under the Management Agreement incurred or accruing after the Closing Date and represents that annexed hereto as Exhibit "1" is a true, complete and accurate copy of the Management Agreement.

3. The Management Commencement Date will thereafter be considered the date upon which Assignee takes title to the Hotel. Manager shall commence performance of Management Services for Assignee/Owner on the Closing Date.

4. The Management Agreement shall be amended as of the Closing Date as follows:

    A. Section 9.1 is revised to change the Base Management Fee to the following percentages of Gross Operating Revenues:

    First Four Months after Commencement Date:
    Months Five through Twelve after Commencement Date:
    Year Two:
    Year Three:

    

    B. Section 11.1 is herby deleted and replaced with the following:

    Term. This Agreement shall be for a period commencing on the Closing Date and continuing until the third anniversary of the Closing Date (the "Initial Term").

    C. Termination Upon Sale. The following is added to Section 11.2: Upon no less than 30 days notice, Owner may terminate, without penalty, this Agreement upon any sale or transfer of the hotel to an unaffiliated third party.

1-28-05

D.      Assignment. Section 13.1 is hereby amended to terminate Owner's right to assign this Management Agreement upon sale of the Hotel.

E.      Section 11.2(D) is added to the Agreement as follows:

Manager's Right to Terminate for Union issues. Manager acknowledges that Owner desires the Hotel to operate as a non-Union hotel. Owner acknowledges and agrees that (a) Manager will not participate or assist Owner in resisting any union campaign or organization efforts by any union, and (b) Manager and its affiliates manage other unionized hotels in the New York City area (including any airport markets servicing the New York City or surrounding areas) and organizational efforts by union(s) and organizational efforts by union(s) with respect to the Hotel employees may affect, disrupt, hinder or interfere with the normal operations at such other hotels managed by Manager and its affiliates. If at any time during the Term, Manager reasonably determines that the operations or labor relations at the other hotels managed by Manager and its affiliates, are actually and materially interfered with, disrupted, hindered or affected as a result of labor relations or labor unrest at the Hotel between the Hotel, its employees or any union (or lack of any collective bargaining agreement in effect for the Hotel) ("Labor Issues"), Manager shall have the right, without penalty, to terminate the Management Agreement by providing Owner at least sixty (60) days prior written notice of termination setting forth in detail the exact basis for such notice, unless Owner cures such Labor Issues to the reasonable satisfaction of Manager (which satisfaction will not be deemed given unless acknowledged in writing by Manager) within thirty (30) days of Owner's receipt of such notice, in which case the notice of termination shall be deemed rescinded. In the event that Manager exercises the termination right described, then Manager shall owe Owner no termination fee.

F.      Section 6.2 is amended as follows:

Upon Closing Date, Owner shall fund the Agency Accounts with Operating funds of at least ▮▮▮▮▮ thereafter, Owner shall maintain at least ▮▮▮▮▮ in the Agency Account. Manager will make a distribution to Owner on a weekly basis of any cash in excess of the Hotel's operating needs plus the ▮▮▮▮ operating funds required herein.

G.      The following is added to Article X (Insurance): Owner shall ensure that Manager is listed as additional insured on all policies. Manager shall obtain all insurance only as approved by Owner in writing in advance.

H.      Section 3.2 is hereby amended to require Manager to allow Owner the opportunity to interview and approve the hiring of the Hotel's General Manager.

I.      The following provision is hereby added to Article XII:

12.2.   Each party represents, warrants and covenants that neither it, nor any of its affiliates (or any of their respective principals, partners or funding sources), is nor will become (i) a person designated by the U.S. Department of Treasury's Office of Foreign Asset Control as a "specially designated national or blocked person" or similar status, (ii) a person described in Section 1 of U.S. Executive Order 13224 issued on September 23, 2001; (iii) a person otherwise identified by a government or legal authority as a person with whom Owner or Manager is prohibited from transacting business; (iv) directly or indirectly owned or controlled by the government of any country that is subject to an embargo by the United States government; or (v) a person acting on behalf of a government of any country that is subject to an embargo by the United States government. Each party agrees that it will notify the other party in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties contained in this Section 12.2 incorrect.

J.      The following provision is hereby added to the Management Agreement as Article 17:

Jan 28, 2005

## ARTICLE XVII:  CENTRALIZED SERVICES; MULTI-PROPERTY PROGRAMS; WIDE AREA NETWORK

17.1.   Manager may, subject to the Budgets and as set forth in Exhibit F hereto[1] (or otherwise approved in writing by Ownership), provide or cause its affiliated companies to provide for the Hotel and its guests the full benefit of any reservations system hereafter established by Manager or its affiliates and provide, or cause its affiliated companies to provide, such aspects of any accounting or purchasing services, other group benefits and services, revenue management services, on-site sales training, associate satisfaction surveys, Manager's national training program and other training as are made available generally to similar properties managed by Manager (individually and collectively, "Centralized Services").  Subject to the provisions of the applicable Budget, Manager or such of Manager's affiliated companies as provide Centralized Services shall be entitled to be reimbursed for the Hotel's share of the total costs that are reasonably incurred in providing such Centralized Services on a system-wide basis to hotels and motels managed by Manager or its affiliates which costs may include, without limitation, reasonable and customary salaries (including payroll taxes and employee benefits) of employees and officers of Manager and its affiliates, costs of all equipment employed in the provision of such services and a reasonable charge for overhead.  The Hotel's share of such costs shall be determined in an equitable manner by Manager (which shall be reasonably satisfactory to Owner) and substantiated to Owner after each Fiscal Year (as hereinafter defined), shall be an Operating Expense of the Hotel and shall be borne by Owner and paid or reimbursed to Manager out of the Agency Account or if the amounts therein are insufficient by Owner upon 10 days' written demand therefore by Manager.  Manager shall maintain and make available to Owner invoices or other evidence supporting all of the charges for Centralized Services.  Notwithstanding the foregoing, Manager's fee for providing centralized accounting services shall be the Accounting Fee (as defined in Section 9.2 hereof).  Owner acknowledges and agrees that (i) Manager has disclosed to Owner the types of Centralized Services Manager currently makes available to properties which it operates, (ii) the Hotel is likely to receive substantial benefit from its participation in such Centralized Services, (iii) Manager is not obligated to provide such Centralized Services under Article III of this Agreement, (iv) Manager is entitled to payment for such Centralized Services in the manner set forth above in addition to its Basic Fee and Incentive Fee, and (v) the receipt by Manager of any such payment does not breach any fiduciary or other duty which Manager may have to Owner.

17.2.   Owner may elect to participate in the Multi-Property Programs (as defined herein) on an annual basis.  Once elected, Owner may not terminate its participation until the following year. Owner shall participate in the entire Multi-Property Programs and shall not be entitled to elect in/out of the individual contracts.  Owner acknowledges and agrees that Manager may in Manager's reasonable discretion enter into certain purchasing, maintenance, service or other contracts with respect to the Hotel (collectively, "Multi-Property Programs"), pursuant to which Manager or affiliates of Manager receive rebates, discounts, cash or other incentives, administration fees, concessions, profit participations, stock or stock options, investment rights or similar payments or economic consideration (collectively, "Manager Rebates") from or in, as applicable, the vendors or suppliers of goods or services provided under such Multi-Property Programs.  Owner acknowledges and agrees that (i) Manager has disclosed to Owner the types of Multi-Property Programs Manager currently makes available to properties which it operates and (ii) subject to the last sentence of this Section, (1) the Hotel is likely to receive substantial benefit from its participation in such Multi-Property Programs which the Hotel could not obtain on its own and for which Manager is not adequately compensated by its Basic Fee and Incentive Fee, (2) any and all Manager Rebates shall be disclosed in writing to Owner and are the sole property of Manager and not Owner, and (3) the receipt by Manager of any Manager Rebates does not breach any fiduciary or other duty which Manager may have to Owner.  Notwithstanding the foregoing, Manager hereby covenants to Owner that the terms of any Multi-Property Programs in which the

---

[1] Manager represents that the items in Exhibit F will not increase the 2005 Budget and expense items approved by Assignor.

Hotel participates, when taken as a whole, shall not be materially less favorable to the Hotel than the prevailing terms of contracts to provide similar goods or services on a single-property basis obtainable on a commercially reasonable basis from unrelated parties in the area of the Hotel. To the extent the Manager Rebates from the Multi-Property Programs exceed all costs and expenses in managing and overseeing the Multi-Property Programs during any Fiscal Year, such excess shall be distributed to the Hotel (allocated ratably among all hotels participated in the Multi-Property Program by multiplying the amount of such excess by a fraction, the numerator of which is the total amount of purchases through the Multi-Property Programs by the Hotel, and the denominator of which is the total amount of purchases through the Multi-Property Programs by all of the hotels managed by Manager that participate in the Multi-Property Programs).

17.3.    With Owner's prior written consent (which Owner acknowledges has been given to manager), Manager shall have the right to install and use Manager's Wide Area Network ("WAN") and associated software at the Hotel throughout the Term. Owner may terminate the WAN upon thirty days advance written notice. WAN installation and connectivity charges and associated software license fees shall be determined in an equitable manner by Manager, subject to the reasonable approval of Owner, shall be an Operating Expense and shall be paid or reimbursed to Manager out of the Agency Account or if the funds therein are insufficient by Owner. The attached Exhibit A sets forth Manager's quote for the WAN hardware, systems design and configuration, project management, audit and design costs and charges. In addition to the WAN, a monthly Sprint data line pass-through connectivity charge of One hundred eighty five Dollars ($185.00) shall be an Operating Expense and shall be paid or reimbursed to Manager out of the Agency Account or if the funds therein are insufficient by Owner (the "Connectivity Charge"). Owner acknowledges that the property currently has the Sprint data line installed.

J.    Section 6.3 is hereby deleted from the Management Agreement.

5.    Notices under the Management Agreement shall be sent to the following:

To Manager:    Crossroad Hospitality Management Company, LLC
4501 N. Fairfax Drive
Arlington, Virginia 22201
Attn: General Counsel

To Owner:    522 W. 38th St. NY, LLC
147-25 Northern Boulevard
Suite 3E
Flushing, New York 11354
Attn:

6.    All Capitalized terms herein will have the same meaning ascribed to them in the Management Agreement.

7.    Upon the effective date of this Agreement, Manager shall use reasonable efforts to assist Assignee in the transition of ownership of the Hotel.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have caused this Assignment to be executed by their respective officers thereunto duly authorized as of the date first above written.

MANAGER:

CROSSROADS HOSPITALITY MANAGEMENT COMPANY, LLC

By: _Alicia Fahim_
Name: ~~Christopher Bennett~~ Alicia Fahiri
Title: ~~SVP, General Counsel~~ Assistant.

Jan 28, 2005

ASSIGNEE:

522 W.38th St. NY LLC

By: _____

Name: _____Shaw (Ai N) Cheng____

Title: _____Owner____

1-28-05