Exhibit H   Part 1 of 2

## Page 1

```
[1]  794CCHEA
[2]  UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
[3]  ------------------------------x
[4]  CHELSEA GRAND, LLC,
[5]                     Plaintiff,        New York, N.Y.
[6]            v.                         07 Cr. 02614 (PAC)
[7]  NEW YORK HOTEL & MOTEL
     TRADES COUNCIL, AFL-CIO,
[8]
[9]                     Defendant.
[10] ------------------------------x
[11]                                      September 4, 2007
                                          3:15 p.m.
[12] Before:
[13]            HON. PAUL A. CROTTY,
[14]                                      District Judge
[15]                    APPEARANCES
[16] BRADY AND ASSOCIATES, LLC,
     ROBERT GLENN RODY,
[17] CHRISTOPHER K. SMITH,
            of Counsel,
[18]
     JEFFER MANGELS BUTLER AND MARMARO, LLP,
[19] PAUL HAMILTON,
            of Counsel
[20] Attorneys for Plaintiff
[21]
     PITTA & DREIER LLP,
[22]       Attorneys for Defendant,
     BARRY NEAL SALTZMAN,
[23] RICHARD MAROKO,
     MICHAEL JAMES D'ANGELO,
[24]       of Counsel
[25]
```

## Page 2

[1]      (Case called)
[2]      THE COURT: Who is going to be speaking for the
[3] petitioners, Mr. Brody or Mr. Hamilton?
[4]      MR. HAMILTON: I will generally, your Honor.
[5]      THE COURT: All right. You want to go ahead?
[6]      MR. HAMILTON: Surely.
[7]      Your Honor, we have some boards I would like to use.
[8] They are demonstrative boards from the record before you,
[9] either direct quotations from documents or they relate to
[10] citations the of cases, and I would like to use those to
[11] express our position.
[12]      THE COURT: All right.
[13]      MR. HAMILTON: I have notified counsel of that
[14] previously.
[15]      THE COURT: Mr. Saltzman, you are on your feet.
[16]      MR. SALTZMAN: We saw them about 10 minutes ago, and I
[17] do not know what's in those cartons. If the court feels it
[18] will be an aid, fine. I have never seen this in oral argument,
[19] and I want to reserve the union's right because, as I said, we
[20] don't know what's in there and whether there is anything there
[21] that we need to object to.
[22]      THE COURT: All right. We will just take it as we go
[23] along then.
[24]      MR. HAMILTON: Thank you, your Honor. May I sit or
[25] should I stand?

## Page 3

[1]      THE COURT: Whatever makes you most comfortable so
[2] long as Mr. Birnbaum can hear you.
[3]      MR. HAMILTON: Thank you, your Honor.
[4]      We have asked your Honor to issue an injunction
[5] staying the action of the impartial chairman in what I think is
[6] an unusual case. In this case, the union asserts that we are
[7] bound to an agreement that requires us to arbitrate disputes
[8] before the impartial chairman. The agreement, an agreement we
[9] did not sign, we signed neither the IWA, which is a collective
[10] bargaining agreement which by its terms is an arbitration
[11] provision; we did not sign the memorandum of the agreement,
[12] which was signed by Interstate with the union, and in both
[13] events, the unusual part of being here today is that we are
[14] being asked, if you will, to abide by and be compelled to the
[15] obedience of the impartial chairman's decision in both the
[16] agreements to which we are non-signatory.
[17]      As importantly, both of these agreements require us to
[18] give up constitutional rights. We have a constitutional right
[19] to speak, to do, as long as we comply with the law. Our right
[20] to speak is to speak our mind to our employees, to tell our
[21] employees how we feel about the union, what we think is in
[22] their best interests; what we think may be wrong with union
[23] representation, as the union has the right to say to them what
[24] they think.
[25]      THE COURT: You are really complaining here about one

## Page 4

[1] of the terms of the contract, aren't you?
[2]      MR. HAMILTON: In part, yes, your Honor.
[3]      THE COURT: That says that you should be -- the
[4] employer has to be neutral with regard to the organizing
[5] campaign.
[6]      MR. HAMILTON: Yes.
[7]      THE COURT: Your real point here is that you are not
[8] signatory to the contract.
[9]      MR. HAMILTON: Those are the two main points, your
[10] Honor. In both instances --
[11]      THE COURT: But I mean if you were signatory to the
[12] contract, you could agree to be neutral during a organizing
[13] company.
[14]      MR. HAMILTON: That's correct, your Honor.
[15]      THE COURT: There wouldn't be any constitutional view
[16] has then.
[17]      MR. HAMILTON: There would not be. We could also
[18] agree to arbitrate.
[19]      THE COURT: Yes, I understand your chief point here
[20] is, though, that Interstate could not bind Chelsea.
[21]      MR. HAMILTON: That is correct, your Honor. And so
[22] what's happened here is by osmosis we are being compelled to
[23] obedience to an agreement that frustrates and thwarts among
[24] other things our constitutional right.
[25]      I spoke to the right to speak. We also have the right

Page 5

[1] to do which is also our right within the law as long as we
[2] comply with the law, and what is our right to do? Our right is
[3] to hire employees, to supervise employees, to manage employees,
[4] to discipline employees, to terminate employees, to set their
[5] compensation, to deal with benefits. That is our right to do.
[6] So the neutral agreement coupled with -- coupled with -- other
[7] strictures placed on us through the collective bargaining
[8] agreement as implemented to the MOA denies us the right to do.
[9] Those are constitutionally protected rights. In neither event
[10] are those rights easily waivable. Yes, indeed, your Honor, if
[11] our signature was on an MOA --
[12]    THE COURT: How about if your authorized
[13] representative's signature is on the MOA?
[14]    MR. HAMILTON: It depends on whether the
[15] representative has the authority.
[16]    THE COURT: Was or was not authorized?
[17]    MR. HAMILTON: That is correct, your Honor. If we
[18] authorized our representative to bind us to arbitrating before
[19] the impartial chairman, to bind us to give up our right to
[20] speak, to bind us to give up our right to do, if we did that,
[21] if we did that, then we are bound by it, your Honor. We didn't
[22] do that, and there is nowhere anyplace in any document that
[23] that right exists on the part of Interstate. If you look at
[24] the Interstate-Chelsea management agreement, nowhere in that
[25] agreement do we empower Interstate to execute an agreement

Page 6

[1] which requires us to arbitrate disputes with the IC or anyone
[2] else. Nowhere in that agreement do we give Interstate the
[3] power to prevent us from determining how we will deal with our
[4] employees.
[5]    THE COURT: Mr. Hamilton, didn't you know that when
[6] you retained Interstate, didn't Chelsea know that Interstate
[7] was already a signatory to the agreement here with the hotel
[8] workers?
[9]    MR. HAMILTON: Actually, no, your Honor. In fact,
[10] Interstate -- here is the sequence of events: We executed the
[11] management agreement with Interstate in February 2003. In
[12] August 2003, we and Interstate agreed that we would be in full
[13] charge, being Chelsea Grand or its affiliated company Star
[14] Perfect. We would be in full charge of the employees. In
[15] January 2004, Interstate executed a memorandum agreement. That
[16] agreement then was made retroactive to an IWA that came into
[17] existence in July 2001.
[18]    Now, your Honor, we did not know, the unrefuted
[19] evidence in this case is we did not know that that MOA had been
[20] executed by Interstate till June 2007. The union didn't inform
[21] us, Interstate didn't inform us, and there is zero in evidence
[22] in the case to the contrary. So we did not know that by that
[23] document, the MOA, and the increasing provision in the MOA. I
[24] am sure your Honor looked -- if I may, let me emphasize
[25] something here -- I am sorry, these aren't set up right --

Page 7

[1]    (Pause)
[2]    MR. HAMILTON: In the accretion provision of the MOA,
[3] one paragraph, it obliquely says that, and the union shall
[4] apply the accretion and card count neutrality provisions to any
[5] hotel or concessionnaire in the New York City area which
[6] continues to be owned, operated, or managed by Interstate since
[7] July 1 2001, without prejudice.
[8]    Now, your Honor, this agreement was signed on January
[9] 15, 2004, made retroactive two and a half years. We didn't
[10] know about it, and we didn't know about it the entire time
[11] period from the time that we -- that Interstate and the union
[12] were talking about it, until January 2007, when we received the
[13] notification from the IC that we were now bound to an
[14] agreement we never knew about, saw, discussed, or talked about.
[15]    THE COURT: Did you participate in the arbitration?
[16]    MR. HAMILTON: We did not, your Honor.
[17]    THE COURT: Why not? Isn't that the place for you to
[18] raise these arguments, "we are not a signatory, we are not
[19] bound by it"?
[20]    MR. HAMILTON: We believe our client's going to the
[21] arbitration would have resulted in a waiver of our client's
[22] rights to force the IC to contest that jurisdiction.
[23]    THE COURT: Why didn't you move to stay the
[24] arbitration then at that time? It seems to me you are trying
[25] to close the barn door after the horse has left.

Page 8

[1]    MR. HAMILTON: Your Honor, in fact the cases permit us
[2] to do that. The cases permit us to stay an arbitration after
[3] an award is made if we had never been part of the arbitration
[4] in the first place. We are not necessarily required to make a
[5] motion at that point; and yes, your Honor, the award came out
[6] in January, January 30, 2003 -- 2007 -- making us a, if you
[7] will, de facto signatory to the neutrality agreement, thus
[8] requiring us by that compulsion to participate in the card
[9] count provisions of the IWA and the MOA. That's the first time
[10] we knew about it. That fact was over, it was done. We weren't
[11] even noticed with the arbitration.
[12]    We put before your Honor two documents, a January 16
[13] notice, January 16, 2007 notice, when that notice was sent only
[14] to Interstate and not to Chelsea Grand. The union knew
[15] Chelsea Grand was the owner of the hotel. We then received
[16] notice of a hearing -- excuse me, a notice of a hearing was
[17] sent out on January 23 and January 25. That notice was never
[18] sent to Chelsea Grand, so the union at that point chose not to
[19] notice us of the arbitration hearing.
[20]    In either event, that notice was re-sent, so the
[21] hearing that took place where the award of January 30 issued
[22] that said we were bound by the MOA and by the IWA. We were
[23] neither noticed nor did we appear, so we could not appear at
[24] something that we were not noticed about in accordance with the
[25] requirements of both Article 75 of the IWA and the requirements

### Page 9

[1] of law in this state.
[2]     THE COURT: What brings us here together today, Mr.
[3] Hamilton, is you are seeking a injunction.
[4]     MR. HAMILTON: That is correct.
[5]     THE COURT: Against further proceedings before the
[6] arbitration panel, and also, you seek an injunction that should
[7] have raised rates; is that correct?
[8]     MR. HAMILTON: Not exactly, your Honor. If I may be
[9] clear on that.
[10]     THE COURT: Yes.
[11]     MR. HAMILTON: Here is what we are seeking to have
[12] enjoined: Pending your final determination in this matter,
[13] whenever that occurs, we want Chelsea Grand to be able to
[14] exercise its right of free speech, that is, to say what it
[15] wishes to say about the union provided it complies with law.
[16] We want -- so we don't want any inhibition on that, and we
[17] don't want the union to go now to the IC, have a hearing, they
[18] set one now for September 25 already to deal with the issue of
[19] the wage increase, so we want to be able to say what we need to
[20] say to our employees without restraint. Under the IC's present
[21] order, we must remain neutral, period. We can't say anything
[22] against the union.
[23]     THE COURT: You are accepting the arbitrator's award
[24] now as binding on you?
[25]     MR. HAMILTON: I am not accepting it as binding.

### Page 10

[1]     THE COURT: If it's not binding on you, you agree to
[2] do whatever you want to do, you are asking me now to advance my
[3] ruling so that you can act as though I have already ruled in
[4] your favor, and you can say what you want to say, which is your
[5] right, except if you contract it away, and do what you want to
[6] do, again unless you have contracted that right away.
[7]     MR. HAMILTON: Your Honor, there is such a thing as a
[8] Hobson's choice, and we are facing it.
[9]     THE COURT: We don't give advisory opinions.
[10]     MR. HAMILTON: I am not asking for one, your Honor. I
[11] am just asking that the playing ground be level so that we can
[12] exercise our constitutional rights so that we can proceed to
[13] determine whether we should have or shouldn't have been before
[14] the IC, because if we are wrong -- if your Honor ultimately
[15] determines in this case that we have de facto been bound to the
[16] IWA, the MOA, and by that the IC's jurisdiction for us, if you
[17] determine that, then the union can and will, it has already
[18] demonstrated that it will seek in the same period that you make
[19] your determination penalties against us. We are immobilized.
[20] We want --
[21]     THE COURT: Mr. Hamilton, they haven't started any
[22] penalties against you. Have they sought to enforce them?
[23]     MR. HAMILTON: Yes, they have, your Honor. They
[24] sought it as we speak. They are before the IC right now.
[25]     THE COURT: Not before me though. They haven't sought

### Page 11

[1] -- these arbitration awards are not self-enforcing. Have they
[2] sought judicial enforcement?
[3]     MR. HAMILTON: They have not, Judge. They have not
[4] sought judicial enforcement, but the bottom line is we already
[5] know that the IC has made a stinging decision imposing
[6] confiscatory penalties on us.
[7]     THE COURT: They are substantial penalties, I agree.
[8]     MR. HAMILTON: If I may say, your Honor, without
[9] quibbling over what is substantial or confiscatory, $1 million
[10] a month, it's our gross revenues. Doesn't even take into
[11] account our expenses. It's everything we receive when we
[12] operate a business, so that is pretty heavy news, so we can't
[13] take that risk again. So anything we do, starting with
[14] contesting the, if you will, the union's statements about us,
[15] about our ownership, anything we do can be deemed to be less
[16] than neutral, if you will, since a neutrality agreement
[17] requires us to be neutral, say nothing bad about the union,
[18] nothing bad about the management, No. 1. No. 2 on the issue
[19] of, if you will, wages, we are required under the IC's
[20] direction to negotiate with the union, and if the union doesn't
[21] like our negotiation, they can say we negotiated in bad faith.
[22] In fact Mr. Ward in his deposition which is before your Honor
[23] stated his view of our negotiations are the union negotiated in
[24] good faith and we negotiated in bad faith.
[25]     THE COURT: Yes. You are not surprised by that.

### Page 12

[1]     MR. HAMILTON: Actually, no, I am not, your Honor, I
[2] am not surprised. But that said, every time Mr. Ward or his
[3] lawyers think we haven't negotiated in good faith, whatever
[4] that means, whatever that process is, whatever the nebulosity
[5] of that process may be, off to the IC they go, and the IC has a
[6] hearing, and the IC says, oh, you didn't negotiate in good
[7] faith, pray tell --
[8]     THE COURT: You are speculating there. They haven't
[9] done that yet.
[10]     MR. HAMILTON: Your Honor, I don't need to speculate
[11] when I have already seen a $35,000 a day penalty confiscating
[12] our business if we don't comply with the IC's order to deliver,
[13] if you will, verification of the card count. That is what that
[14] order was supposed to do when we say we are not parties to this
[15] document, to this agreement, but going on, they will say we
[16] didn't -- again we didn't bargain properly. So they also say
[17] that, among other things, you are not bargaining properly, we
[18] didn't take into account we have to raise the wages to what the
[19] union says is the scale they have with other hotels. If we
[20] don't do that, we are negotiating in bad faith, so the union
[21] will say, and off to the IC we go again.
[22]     So our freedom is, if you will, to do, our
[23] constitutional right is being frozen unless we are willing to
[24] take the risk of another IC penalty. Now, your Honor, I am not
[25] asking this court to do anything but level that playing field

Page 13

[1] so that at least if we do what we do, we are not going to be
[2] exposed to that violation of the IC'S order, and that is part
[3] of what our concern is.
[4]      We can't set any conditions of our own compensation
[5] without walking into the union and having Mr. Ward say, well,
[6] you know, that is unreasonable that you want to pay them $19 an
[7] hour instead of what I say is $21, or you want to give them
[8] this much time off instead of that much time off. That is
[9] unreasonable. So off again we march to the IC. So we are
[10] beset during the pendency of this proceeding with that, if you
[11] will, risk.
[12]      Now I want to go to the last of the most important
[13] issues, the Sheraton. Mr. Huk with some elaborate statement in
[14] his affidavit what the risk is. We are a franchisee of the
[15] Sheraton brand. The Sheraton brand requires us to meet certain
[16] of their criteria concerning the performance of the hotel
[17] particularly in guest satisfaction. We received one, for want
[18] of a better word, shot over the bow, warning letter from them
[19] telling us we had not met their defined criteria. It all has
[20] to do with performance, performance has to do with employees of
[21] the hotel and the management of those employees.
[22]      THE COURT: This is your letter of August 31?
[23]      MR. HAMILTON: No, that is the letter of June -- let
[24] me see here -- May 29. That is the letter of May 29.
[25]      THE COURT: I have another one here that Mr. Brody

Page 14

[1] sent me on August 31.
[2]      MR. HAMILTON: Yes, your Honor. Now, that letter is a
[3] notice --
[4]      THE COURT: A follow-up.
[5]      MR. HAMILTON: Not just a follow-up. It's got real
[6] words in it. I am sorry, let me read the second one. It
[7] states this letter constitutes a first notice that if the hotel
[8] scores below the default benchmark on the following quarter
[9] report, licensor may place your license agreement in default.
[10]      What does that mean, your Honor? It means our loans
[11] will be in default, our loan covenants among other things.
[12] What does it mean? The next step means that we are defaulted.
[13] What happens if we are defaulted? Sheraton can terminate us.
[14] What happens if we are terminated? By the way, everything I am
[15] saying to is Mr. Luk's affidavit. If we are terminated, we
[16] lose the brand, we lose the brand's referrals to our hotel, we
[17] lose the brand's patronage, we are unable to easily get another
[18] brand to replace it. At best, at best, we will be left with a
[19] third- tier brand that will come in. We couldn't get a Hilton,
[20] we couldn't get another top quality brand to come in because we
[21] have been defaulted for poor performance, the satisfied-guest
[22] requirements.
[23]      So how do we manage that? We need to manage our
[24] employees, we need to have our own ability to deal with our
[25] employees, to bring their performance up to an acceptable

Page 15

[1] level, to Sheraton's --
[2]      THE COURT: Who is going to do that, your affiliate or
[3] Interstate?
[4]      MR. HAMILTON: We do that. Interstate has nothing to
[5] do with that, your Honor. Interstate is out of the management
[6] picture of our employees in this matter and has been out since
[7] August or September 2003.
[8]      THE COURT: Who is performing the management function
[9] that Interstate?
[10]      MR. HAMILTON: Star Perfect is the company whose
[11] ownership is roughly the same as the ownership of the hotel.
[12] Star Perfect has its own officers and other persons who
[13] supervise the employees.
[14]      THE COURT: Do you still have a relationship with
[15] Interstate?
[16]      MR. HAMILTON: We do at this moment.
[17]      THE COURT: What does Interstate do for you?
[18]      MR. HAMILTON: Interstate does nothing but consult for
[19] us and with us. They manage somewhat our franchise function,
[20] they manage our accounting function, they will manage -- they
[21] give us recommendations on how we can better cause the hotel to
[22] perform, but they do not recruit, they do not employ, they do
[23] not discipline, they do not fire, any employees.
[24]      THE COURT: They make recommendations on any of those
[25] functions?

Page 16

[1]      MR. HAMILTON: They make recommendations certainly on
[2] the discipline function, yes. They are experienced but they do
[3] not perform the function. That function has been solely
[4] committed to ownership of this hotel, or Star Perfect; and for
[5] purposes of our discussion, your Honor, one can assume Star
[6] Perfect is Chelsea Grand because its owners are essentially the
[7] same, and some of its owners are the direct managers of Star
[8] Perfect, and the overseer of all of this, Hung Luk, who is the
[9] executive director of Chelsea Grand is also the overseer of
[10] Star.
[11]      THE COURT: What is Mr. Hung Luk's relationship with
[12] the Lam organization?
[13]      MR. HAMILTON: Mr. Luk is the executive director of
[14] the Lam organization, in particular as it relates to the
[15] operations of any hotels it owns. He runs the hotels.
[16]      THE COURT: Here in the United States or worldwide?
[17]      MR. HAMILTON: Actually in New York. I am not sure,
[18] he may have one or two in New Jersey, I am not sure, but in New
[19] York, yes. Mr. Luk is the operations man, he runs the hotels,
[20] and he makes the decisions concerning the hotels.
[21]      THE COURT: Is there anything you want to show me on
[22] those charts?
[23]      MR. HAMILTON: I was going to show you, but, you know
[24] what, they didn't get turned around right here. If I may hold
[25] on, your Honor.

## Page 17

(Pause)

MR. HAMILTON: First of all, I want to deal with the issue of apparent authority. We have lots of briefing been done on that issue. There is no way that this union in any way relied upon the apparent authority of Interstate to bind us to the IWA, to arbitration, or to be part of the MOA. Why is that? First of all, Mr. Ward testified that he did not review the management agreement between Interstate and our client, so he certainly could not have relied on that.

Secondly, Mr. Ward testified that he did not ever contact Chelsea Grand to see whether or not it agreed to be bound by the MOA or by the IWA. No. 3, at the time the MOA was executed between Interstate and Chelsea -- and the union -- there was no discussion of whether or not Chelsea Grand was to be part of the accretion provision in that document, so it's certainly not in Mr. Ward's mind that Chelsea Grand would be one of the accreted hotels who, if you will, the MOA and thus be bound by the neutrality provision.

THE COURT: How long has this hotel been in operation?

MR. HAMILTON: Since December 2003.

THE COURT: When did the union organizing effort start?

MR. HAMILTON: In January 2007.

THE COURT: What happened, between December 2003 and all the way from 2004, 2005, and 2006 you had no awareness,

## Page 18

Chelsea had no awareness at all of conversations and discussions that were ongoing between Interstate and the union with regard to the Chelsea hotel?

MR. HAMILTON: Chelsea was aware from Interstate that the union wanted to organize the hotel, unionize the hotel. Chelsea consistently told Interstate it had no desire to unionize or permit the union to organize the hotel, and they had no desire to talk to the union. There were no discussions.

THE COURT: Did Interstate say when they were told that, we have no interest in representing you if it's jeopardizing our relationship with the union?

MR. HAMILTON: They did not, your Honor. At no time has Interstate ever told Chelsea Grand that its relationship with the union with respect to the other hotels it managed.

THE COURT: I will ask Mr. Saltzman the same question. My recollection is that in his papers he makes a point of the fact that Interstate could back out of the arrangement with Chelsea if it placed its relationship, long-term relationship with the union in jeopardy. You knew that, and Chelsea knew.

MR. HAMILTON: We did know that, and we also knew in the same agreement in the sentence before that sentence that it says Chelsea does not want the hotel unionized. So we have Interstate in contract with Chelsea where in the first sentence of paragraph 16.1 it says Chelsea does not want the hotel unionized. Then it says, but if Interstate believes some

## Page 19

attempt by the union to unionize the hotel threatens Interstate's position with the union concerning other hotels it manages, it can terminate the agreement without penalty. At no time did Interstate seek to terminate the agreement, at no time.

THE COURT: The question arises, Mr. Hamilton, why did Chelsea select Interstate which at the very least had dual loyalties here, not only the contract loyalty to you but loyalty under the industry-wide agreement to the union?

MR. HAMILTON: There are a couple of reasons.

THE COURT: One is I suppose that Sheraton told you to get a competent managing agent.

MR. HAMILTON: You got it. That is one of the reasons at that time, at that time. We were a new hotel, new in the Sheraton family. They did not know us, they didn't know what we could or couldn't do in the way of self-management, so they insisted that we have an acceptable third-party operator.

THE COURT: Why don't you take the third party the way you find them? The third party has all these ganglia attached to it, and one of those attachments is its affiliation or relationship with the hotel workers here in New York City. Why aren't you troubled by that?

MR. HAMILTON: No, that is not the issue. If I can say -- may I say why it's not the issue?

THE COURT: Sure.

## Page 20

MR. HAMILTON: We knew when we signed the management agreement that Interstate did have relationships with the union. It says so. Interstate also -- and the second reason I was going to give your Honor is that Interstate was a management company that managed one of our other hotels at a previous time. It was not unionized, by the way.

THE COURT: In New York?

MR. HAMILTON: Yes, in New York. It was not unionized. So they were a competent management company. After we executed the contract with them, we decided we wanted to manage the employees, and they agreed. That is all in evidence here unrefuted, your Honor. So that situation changed. We allowed -- we wanted Interstate to remain and we paid them a fee, by the way, substantial fee, to remain, because we wanted to gain their assistance or their consultative abilities particularly in franchise relations with Sheraton. They were an accepted, well-performing management company with Sheraton, so we wanted them for that. We surely did not want them -- it wasn't inimical to our interests that they would be a management company that would do good for us with the union. We didn't want a unionized hotel. That was clear in our agreement. It was clear in all of our communications with Interstate. So that was not the reason.

So as you say, your Honor, well, you got all the ganglia, if you will, yes indeed, we did get Interstate with a

Page 21

[1] socalled ganglia that they were in contract with the union, I
[2] guess, on other hotels prior to the time that we had executed
[3] the management agreement with them. That said, we provided for
[4] their exit if they felt that their relationship with the union
[5] was inimical to our interests, and they did not exit.
[6]      Now why is that, your Honor? We didn't know -- we did
[7] not know from February 2004 to January 2007 that the union --
[8] that Interstate had executed an agreement binding us by, if you
[9] will, osmosis to a retroactive incorporation are the IWA two
[10] and a half years earlier that we would remain neutral in all
[11] events if they sought to unionize us. We don't know that. We
[12] are almost for the better part of two and a half years, so we
[13] couldn't be accountable for what we don't know.
[14]      THE COURT: Your point here is that until February of
[15] 2007, you were unaware of Interstate's arrangement with the
[16] hotel workers union, and therefore, whatever Interstate did was
[17] not authorized by Chelsea, and so Chelsea cannot be bound by
[18] the conduct of Interstate?
[19]      MR. HAMILTON: That is correct, your Honor.
[20]      THE COURT: With regard to this contract.
[21]      MR. HAMILTON: That is correct, and I would still
[22] want, if I may, to finish up on the issue of apparent
[23] authority.
[24]      THE COURT: Yes.
[25]      MR. HAMILTON: We know that the union -- that Mr. Ward

Page 22

[1] knew that he really couldn't bind a non-signatory hotel to the
[2] MOA. He knew that. Why is that? We have found other
[3] agreements executed by the union with other hotels where
[4] Interstate was identified as the agent having the legal power
[5] to bind the hotel. One of those agreements was an agreement
[6] with the Wingate Hotel in May 2007. The union executed an MOA
[7] with that hotel whereby Wingate through Interstate signed that
[8] agreement.
[9]      Here there is no agreement signed by Interstate as our
[10] agent with that recognition, with that recognition where they
[11] were the owner or the manager of our hotel, as it says up here.
[12] There was no such agreement ever signed. Why did the union
[13] cause this to be signed?
[14]      And there are more, your Honor. There are more
[15] things, but apparent authority, the IWA itself, has a signature
[16] page. The IWA, as your Honor I am sure knows from the
[17] affidavits of the union, was a negotiated agreement with the
[18] Hotel Association of New York. Can you see this, your Honor?
[19]      THE COURT: I can recognize the signature of Mr. Ward
[20] and Mr. Spinnato.
[21]      MR. HAMILTON: All right. Now, it's interesting that
[22] is their signature, and on the last pages of that document are
[23] signature pages for other hotels and for other operators. Here
[24] is a signature page -- by the way these are two separate
[25] signature pages.

Page 23

[1]      THE COURT: Yes, I understand.
[2]      MR. HAMILTON: Employer operator, now that's different
[3] than a property owner, it's different than employer operator.
[4] We are a property owner.
[5]      THE COURT: Right.
[6]      MR. HAMILTON: So by the intent are the parties to the
[7] IWA --
[8]      THE COURT: And the employer operator for your
[9] operation would be?
[10]      MR. HAMILTON: Chelsea Grand. Actually, no, excuse
[11] me, the property owner would be Chelsea Grand, the employer
[12] operator would be Interstate. So here the clear intent of the
[13] very signatories to the IWA to bind other parties to the IWA is
[14] found in the signature pages on that document that require the
[15] signature of an operator with Interstate on a separate page and
[16] the signature of an owner like us on a separate page. So how
[17] could Mr. Ward, advised by one of the finest labor law firms in
[18] this state, how could he possibly assume that there was
[19] authority to Interstate to bind us when the very document which
[20] gives rise to arbitration rights requires two separate
[21] signature pages of other parties to be bound to it? How could
[22] they do that?
[23]      THE COURT: I am sure Mr. Saltzman will tell us.
[24]      MR. HAMILTON: I am sure that he will. I am sure
[25] there will be an answer to that. And there is more, your

Page 24

[1] Honor. This is another amendment to the agreement, the IWA
[2] which was signed on January 15, 2004, involving the Muse Hotel.
[3] That is another MOA, so to speak, signed by Interstate directly
[4] on behalf of Muse Hotel, and you can see it shows on its own
[5] behalf as operator and behalf of Muse Hotel.
[6]      There is no such document signed in that capacity by
[7] Interstate on behalf of Chelsea Grand. So the union knew that
[8] in order to bind a hotel, it had to have a representation that
[9] an operator like Interstate could bind a hotel to the MOA and
[10] the --
[11]      THE COURT: How do you know that the union knew that?
[12] Perhaps that is the best way, that is a better way of doing it,
[13] but other alternatives would deliver the same result as a
[14] matter of law. This is one form of doing it. Clearly it shows
[15] the authorization.
[16]      MR. HAMILTON: Again, your Honor, it goes to apparent
[17] authority. What does a reasonable person do? What is a
[18] reasonable person in this business relying on? What is it that
[19] the union is relying on? That is what we are talking about
[20] here.
[21]      Well, they didn't rely on seeing a management
[22] agreement. Never saw that. They didn't rely on a statement of
[23] authority because they couldn't rely on Interstate's statement
[24] of authority. That's also law. They have to rely on our
[25] statement of giving them authority. So it's the principal's



Page 25

[1] acts or statements that can bind the principal to the apparent
[2] authority of a Agent.
[3]     THE COURT: What do you say about in this time period
[4] of January and February of 2007 where there was some suggestion
[5] that Chelsea Grand would sign the agreement, and then according
[6] to -- I don't know if the right word from Mr. Saltzman is
[7] reneged but they backed out on that tentative arrangement Which
[8] Interstate announced to the impartial chairman.
[9]     MR. HAMILTON: Your Honor, I know of no evidence
[10] anywhere any place in this record in a sworn testimony by
[11] anybody other than what Mr. Saltzman might speculate, there is
[12] no evidence in this record that I am aware of that Chelsea
[13] Grand ever agreed to be bound by the IWA or the MOA. There is
[14] no evidence. So if there is a reference to that, I would ask
[15] Mr. Saltzman, through the court, of course, to show that exact
[16] reference, because I don't believe that is the fact, your
[17] Honor. As a matter of fact I am certain it is not the fact.
[18]     In January, February of this year when the actions
[19] were happening before the IC, Chelsea Grand was obstinate in
[20] its unwillingness to agree (a) to unionize, and (b), to be
[21] bound by the IWA or the MOA.
[22]     Again, your Honor, I want -- I hate to keep
[23] emphasizing this point, but when are you dealing with -- when
[24] you are dealing with apparent authority, you have to act
[25] reasonably, and in acting reasonably, you do what an ordinary

Page 26

[1] -- what a person does in this case in this business, and again
[2] Mr. Ward has testified himself out of any ability to
[3] justifiably rely on Interstate's authority, and I want to make
[4] this point with a scalpel your Honor: Authority to bind
[5] Chelsea Grand to an agreement to arbitrate. There is a
[6] difference between an agreement to arbitrate where you are
[7] giving up rights, huge rights, to have your dispute determined
[8] in a court of law as opposed to an arbitrator, there is a
[9] difference in giving up those rights than in perhaps agreeing
[10] to have a grievance determined by an arbitrator, if you will,
[11] and we protect -- there are a lot of protections given to
[12] non-signatories, and when you deal with apparent authority, and
[13] the cases seemingly say with relative consistency, that a
[14] person relying on the apparent authority of an agent must do so
[15] reasonably. They are at risk of a person relying, they don't
[16] make inquiry of that which they should inquire about.
[17]     What did Mr. Ward do? Never made any inquiry. He
[18] assumed that when Interstate signed the MOA it could bind by
[19] that nebulous provision every hotel it managed retroactively to
[20] an agreement that existed before we even executed our
[21] management agreement with Interstate.
[22]     He assumed that. It's not a rational assumption by a
[23] man who is president of a union, a union that has relationships
[24] with perhaps hundreds of hotels in New York City. He knows
[25] what the rules of engagement are, and he didn't follow them, so

Page 27

[1] he could not have reasonably relied on those acts, and the fact
[2] that the union -- the fact that the union also knew we were not
[3] unionized before they signed the MOA, that should tell them
[4] there is a issue there. Why couldn't they inquire of the
[5] owner, do you wish to be unionized? Do you give authority to
[6] Interstate to enter an agreement with us that would require you
[7] to be neutral?
[8]     THE COURT: Maybe they thought them didn't have to.
[9] You just described under the master agreement that there is two
[10] counts. One is for the operator, another one is for the owner
[11] of the property. So if either one can deal with the union, it
[12] doesn't need both.
[13]     MR. HAMILTON: May I suggest, your Honor, it does.
[14]     THE COURT: It does?
[15]     MR. HAMILTON: Look at what it says. Property owner
[16] if different from employer operator. We are not the employer
[17] operator. The operator is Interstate. We are different. We
[18] are Chelsea. We own the property. We are different from the
[19] operator. By the agreement itself, it requires, if you will,
[20] that they give -- that they certainly give credit to this, why
[21] not come to us.
[22]     Had they come to us, your Honor -- that is the other
[23] thing here -- had the union come to us when they were
[24] considering the MOA, and if they considered it, Chelsea would
[25] be part of that accretion provision, had they come to Chelsea,

Page 28

[1] they knew who we were, they knew we owned the property, they
[2] knew we weren't union. A phone call --
[3]     THE COURT: You had no contact with the union from the
[4] time you opened the hotel through 2007; is that right?
[5]     MR. HAMILTON: Yes. I am going through the inventory
[6] of evidence.
[7]     THE COURT: I thought you were calculating there.
[8]     MR. HAMILTON: No, I ran my calculator through the
[9] evidence. The answer is yes to that question.
[10]     So again, your Honor, I say you can't bind somebody to
[11] arbitrate with you by osmosis. It can't happen. And that's
[12] what happened. But worse, that's the important part of this,
[13] legally speaking, you can't bind somebody to give up their
[14] First Amendment rights easily.
[15]     THE COURT: I don't think that is your key argument.
[16] I think your key argument is that you didn't authorize
[17] Interstate to enter into this agreement, and Interstate was not
[18] authorized to enter into the agreement. If there is a valid
[19] agreement here though, you can give up your constitutional
[20] rights. That happens all the time.
[21]     MR. HAMILTON: I am agreeing with you, your Honor, in
[22] this context: If Chelsea Grand was on this document right
[23] here, Chelsea Grand so-and-so, we wouldn't be talking.
[24]     THE COURT: You would be --
[25]     MR. HAMILTON: The deal was done, OK. But the plain

Page 29

[1] fact is you can't by osmosis infuse their signature over here.
[2] In particular you are dealing with a constitutionally protected
[3] right. I mean, the cases we cited to your Honor say the First
[4] Amendment rules are to be respected. One case says they cannot
[5] be lightly waived. Another case says they can't be lightly
[6] waived by an agent right on point, exactly this case.
[7]     THE COURT: I got your point now, Mr. Hamilton. Thank
[8] you very much.
[9]     MR. HAMILTON: Thank you very much, your Honor.
[10]    (Pause)
[11]    THE COURT: I think what I will do, Mr. Saltzman, when
[12] the plaintiff shows up for the 4 o'clock, it's going to be a
[13] short matter and I don't want to limit you, so and I don't want
[14] them to wait, so we will stop then.
[15]    MR. SALTZMAN: Should I start now?
[16]    THE COURT: Yes.
[17]    MR. SALTZMAN: Very good, your Honor. Good afternoon,
[18] your Honor. First rule of intervention is always do no harm.
[19] That is a cardinal Hippocratic rule because before the
[20] physician takes the scalpel, when the judge invades the body of
[21] the facts, the first question is will things be better
[22] afterwards. They might wind up worse. And that wisdom is
[23] incorporated all the restrictions on preliminary injunctions.
[24] Nothing stated in the hotel's briefs, papers, affidavit,
[25] supplementary affidavits, second supplementary affidavits, or

Page 30

[1] today in court, changes the fact that they have not carried
[2] their burden of justifying the court's intervention into the
[3] body of existing facts.
[4]     I am going to first try to just sum up the issues
[5] here, and it's a little bit scattered, but the first one is
[6] Mr. Hamilton's statement that this is an unusual case. The
[7] union's contention is it's not an unusual case, that in fact in
[8] industry practice, as our witnesses would state and have stated
[9] in arbitration, as Interstate clearly acting and they are a
[10] party in the sense that they certainly have an interest in
[11] what's going on, and they testified by their actions, the
[12] industry practice is that the manager manages, the manager
[13] binds the owner. That is our industry practice just as it was
[14] in that Property Advisory case on which we rely and recite in
[15] our brief.
[16]    But that is unusual, that question is the ultimate
[17] question. That isn't the question today. The question today
[18] is, do you intervene? The ultimate question will be decided
[19] when all the facts are in, when you have a full record, and
[20] then we will live by that. But they are asking you to
[21] intervene before the facts are in, before the record is in, and
[22] make the ultimate decision on this motion, which we think is
[23] inappropriate.
[24]    The reason that we are here is worth remembering. We
[25] all started with the idea that they have to increase the wages.

Page 31

[1]     THE COURT: That is my recollection too from the
[2] transcript of June 27.
[3]     MR. SALTZMAN: Right.
[4]     THE COURT: When Mr. Brody said he wanted
[5] authorization to increase wages and I said, well, if you want
[6] to make an injunction against further arbitration, you can.
[7]     MR. SALTZMAN: Right, and that was the end of June.
[8] The reason I raise that is to put into framework what we are
[9] talking about in terms of irreparable harm. The things they
[10] want to do, whether it's raise wages or training or anything
[11] else, they do, they can do that. There is nothing that stops
[12] them from doing that.
[13]    THE COURT: Except they are afraid they are going to
[14] get hit over the head by what the arbitrator does.
[15]    MR. SALTZMAN: Correct.
[16]    THE COURT: Their argument really is, I think,
[17] Mr. Saltzman, once bitten, twice warned. You have got this
[18] very bad arbitration decision which they think is unfair
[19] arbitration and it's not that clear Mr. Saltzman is going to do
[20] it again, so we want to prevent him from doing that.
[21]    MR. SALTZMAN: Mr. Saltzman does not have the
[22] authority to do so. The union has agreed, not yet implemented
[23] they have not yet implemented the increase they said they would
[24] implement. The reason I raise it, your Honor, is that we are
[25] one step away from irreparable harm. They can do what they

Page 32

[1] want, but it's an indirect, irreparable harm, it's in what they
[2] mean what we want to do in response to the --
[3]     THE COURT: Can I interrupt you a second? The parties
[4] are here. We will just call them up here. I will take it here
[5] at the sidebar.
[6]     (Recess)
[7]     THE COURT: All right, Mr. Saltzman. Thank you very
[8] much.
[9]     MR. SALTZMAN: Thank you very much.
[10]    Staying for a moment with the irreparable harm
[11] question, we do have something that is somewhat unusual. We
[12] have a conflict in testimony between Chelsea and Chelsea. We
[13] have Mr. Luk -- the only reason we know or we believe there is
[14] a possibility that there may be some harm or risk that Starwood
[15] is going to pull out is because of Mr. Luk's affidavit
[16] explaining what is the meaning of the letters from Starwood and
[17] even though --
[18]    THE COURT: Mr. Luk is who Mr. Hamilton refers to as
[19] Mr. Hung?
[20]    MR. SALTZMAN: Hung Luk, Mr. Hung Luk. Contradicting
[21] Mr. Luk is Mr. Lam. Mr. Lam at deposition expressed amazement
[22] at the concept, and said, I have ten years in my agreement, how
[23] can they do that?
[24]    Now, I understand --
[25]    THE COURT: Maybe he didn't read the agreement.

Page 33

MR. SALTZMAN: Maybe he didn't. On the other hand, he is the head of the company, and so what we do have is two conflicting testimonies from Chelsea.

THE COURT: You know the hotel industry, capture and cancel if you have.

MR. SALTZMAN: I don't know what their franchise agreement says. Ultimately, franchises can be taken away, but there are many steps, many, many steps. I don't know that the steps that Mr. Luk stated are what he says they are, and Mr. Lam evidently doesn't think they are either, so we don't know. We don't know that piece of evidence at that point. We have a conflict.

The other thing that I want to point out on irreparable harm is they are saying, look, we are worried about this flag. We have to improve our performance. The point of performance that Starwood brings to their attention is guest satisfaction, and on that I want to cite the Second Circuit in Emory, Emory Freight, which is cited in our case, in our brief, and I believe is at the lead cases on this issue.

The Second Circuit said, at page 101, and it's 786 F.2d 101: "Emory also asserts that diminished customer confidence in its operations will result from the mere possibility that the union will prevail at arbitration, but even if that were a ground to stay arbitration, which it is not, we fail to see how arbitration would pose a greater risk

Page 34

to Emory's business than the acrimonious labor dispute and strike now prevailing."

The Second Circuit cautions us all that in this kind of a situation, arbitration is actually salutary. It dovetails with the federal labor policy. If we cannot arbitrate, if we are stayed from bringing our -- giving the employees the voice to raise their grievances before an industry arbitrator, then under the Steel Workers trilogy we have no recourse but economic warfare, that is a strike or picket or a big 10-foot rat, or any of the other things that unions do under the First Amendment in the city, and it is impossible to understand why the body of the facts and the state of these facts would be off if we could not arbitrate.

THE COURT: What about Mr. Hamilton's point? He is suffering under all these burdens now because he's given up certain -- he believes he can't say certain things and he can't do certain things, he can't tell the employees it's a bad thing to join the union or consider this, he can't discipline his employees in a certain way. He is restricted with regard to pay increases, all because those are conditions set forth in the industry-wide agreement or the memorandum to which he is not a signatory.

MR. SALTZMAN: First of all, your Honor had stressed that he is not a signatory issue by noting that if his agent or his joint employer bound him, then he is under no different

Page 35

situation.

THE COURT: He says his agent was not authorized.

MR. SALTZMAN: He says that, and that is the ultimate question we started with, and which we don't have the record yet. And the union will address that on this motion by pointing out, and we can even use the exhibits that, by the way, are modified from the originals somewhat, but I don't know that they are materially modified. It's to prove the industry practice.

First of all the 2001 industry-wide agreement, 2006 industry-wide agreement, that is the way it looks when it's printed up in booklets. Mr. Ward testified at his deposition that he doesn't think anybody signs it any more like that, and as far as he is concerned, he has got Mr. Spinnato's signature, and as far as he understood it, those other lines are just left over from the bygone days when they used to have those being printed over and over. And that is what he said in answer to their questions about it.

It's also important to know that, as the court pointed out, the union loves signatures, we will get anybody to sign our agreement no matter what. We will find out later what it is. Sign the agreement precisely in order to avoid the kind of argument that we are getting today.

THE COURT: But Chelsea never signed. That seems to me Mr. Hamilton's point in a nutshell. Chelsea never signs,

Page 36

and Interstate was never authorized on its behalf to sign, so he is in this quagmire where you keep pummeling by going to the office of the independent chairman and getting arbitration rulings surprisingly in your favor, and which are very expensive and have an in terrorem effect with regard to Chelsea.

MR. SALTZMAN: Tye only have the in terrorem effect is the extent that Chelsea feels that they might be binding on them. The other thing is that we do believe that they -- we do have apparent authority because of the industry practice that we have spoken about, that has already been testified to at the arbitration, that is in the affidavit of Mr. Maroko, that is in the 2001 agreement and the 2006 agreements which talk about the binding power of the card check neutrality on the manager or agent. That is the standard.

THE COURT: What about Mr. Hamilton's point that Interstate entered into the MOA subsequent to its arrangement with a Chelsea and never told Chelsea about it.

MR. SALTZMAN: A number of responses to that. First, the MOA is a January 2004 document. The industry-wide agreement, 2001 in which the card check neutrality provisions first appear is actually agreed to in June of 2000. It didn't become effective until the following year. Interstate was bound by the industry-wide agreement as a manager for all the properties it operated as of the 2001 agreement.

Page 37

[1]   THE COURT: What was the MOA then in 2004?
[2]   MR. SALTZMAN: 2004 the MOA was a particular agreement
[3] between Interstate and the union because, as Mr. Maroko's
[4] affidavit makes clear, Interstate came and said, we have got a
[5] problem with the application of your card check neutrality unit
[6] to a couple of properties, and they named them, and we
[7] bargained over that, we gave consideration for it, and we
[8] excluded the one property, one hotel and a Starbuck's in the
[9] Park Central. Park Central is already under the industry-wide
[10] agreement, and it's an exhibit attached to Mr. Ward's
[11] affidavit. You have a list of all the hotels that had been
[12] authorized by the Hotel Association, both the 2001 and 2006,
[13] both of those contract years, and the Park Central Hotel and
[14] the Roosevelt Hotel were managed by Interstate, and therefore
[15] Interstate was already under the IWA in 2001 under the card
[16] check neutrality.
[17]   THE COURT: Tell me a little more about this. They
[18] are already subject to the agreement because they signed the
[19] industry-wide agreement effective as of 2000, and they wanted
[20] relief from that agreement?
[21]   MR. SALTZMAN: Yes.
[22]   THE COURT: And that was the subject of the MOA?
[23]   MR. SALTZMAN: Correct.
[24]   THE COURT: The union let them out of the card check
[25] neutrality provisions?

Page 38

[1]   MR. SALTZMAN: The union negotiated with Interstate.
[2] Interstate asked for one property to be let out, an airport
[3] hotel far out on the fringes, and a Starbuck's in the Park
[4] Central. In return --
[5]   THE COURT: What was the one hotel out in the --
[6]   MR. SALTZMAN: It was a courtyard Marriott at JFK.
[7] But as to everything else, everything else Interstate operated
[8] was under the IWA and continued. It didn't vary under the MOA,
[9] under the memorandum of agreement that came about in 2004.
[10]   Now, Interstate -- we don't know what Interstate is
[11] going to say, because Interstate isn't here right now and
[12] Interstate hasn't been deposed. Interstate hasn't put in any
[13] affidavits. So we only know from their actions what their
[14] position appears to be, and we think their position clearly
[15] operates consistent with the industry practice of a management
[16] operating and binding the owner. Otherwise, they are
[17] arbitrating their agency, if you believe what Mr. Hamilton
[18] says, and I don't know if you can make that presumption. They
[19] certainly told Chelsea that they have agreements with the
[20] union. They certainly told --
[21]   THE COURT: "They" being Interstate?
[22]   MR. SALTZMAN: Interstate, before they signed the
[23] management agreement with Interstate -- with Chelsea -- we have
[24] got agreements with this union. The fact is we really care
[25] about our relationship with this union, and we care about it

Page 39

[1] more than you, and the citation to that, it's in our brief.
[2]   THE COURT: I thought I read in it your brief.
[3]   MR. BRODY: Yes, it is in our brief, and it cites to
[4] the deposition testimony of Hung Luk, and it's page 5 of our
[5] brief. There is a whole string of deposition testimony.
[6]   THE COURT: Is that the one at the top of page 5? You
[7] can't really tell when you do this by ECF, Mr. Saltzman. The
[8] pagination changes.
[9]   MR. SALTZMAN: It is -- it's page 4, starts at the
[10] bottom of page 4.
[11]   THE COURT: What words?
[12]   MR. SALTZMAN: Indeed, Interstate informed Chelsea
[13] that its relationship with the union was more important to it
[14] than its relationship with Chelsea, and according to Chelsea,
[15] they attempted to persuade Chelsea to meet the union, and there
[16] is a citation to various pages from Mr. Hung Luk's deposition.
[17]   So Chelsea was clearly informed by Interstate that
[18] Interstate -- they said, here is the 2001 industry-wide
[19] agreement, we want you to read this provision carefully and see
[20] your lawyers about it
[21]   THE COURT: Here is Mr. Hamilton's problem: Chelsea
[22] told Interstate it didn't want to operate in that union. It
[23] wanted to operate on a non-union basis. I don't think there is
[24] any doubt about that, is there?
[25]   MR. SALTZMAN: No. I am sorry, I thought based on

Page 40

[1] what Chelsea has told us, we have no reason to think that is
[2] not true.
[3]   THE COURT: All right. Then Interstate eventually
[4] does what that makes --
[5]   MR. SALTZMAN: It enters into an agreement, management
[6] agreement with Chelsea to manage the property.
[7]   THE COURT: And by entering into that agreement,
[8] notwithstanding Chelsea saying, I don't want you to -- I don't
[9] want to be burdened with a union contract, I want to be
[10] operating free and clear, I want to be operating on a non-union
[11] basis, notwithstanding that statement, what is it about
[12] Interstate's relationship with the union that makes Chelsea
[13] subject to the union contract?
[14]   MR. SALTZMAN: First of all, the statement that we
[15] would like to operate non-union, my client will forgive me, I
[16] think that is fairly what most employers would rather do. That
[17] is not a big surprise.
[18]   THE COURT: No.
[19]   MR. SALTZMAN: And it's not -- the question then
[20] becomes, well, what if you come under pressure which says you
[21] have to have a card check neutrality agreement or you have to
[22] allow the union to try to organize? What do you do next? And
[23] that management agreement has many, many provisions saying what
[24] Interstate can and cannot do, very specifically in some areas.
[25] What it doesn't say is you cannot deal with the union at all,