Exhibit H  *Part 2 of 2*

Page 41

[1] just we'd rather operate non-union and in the very next
[2] sentence, very next sentence --
[3] THE COURT: Card check neutrality is not a requirement
[4] of law, correct?
[5] MR. SALTZMAN: No.
[6] THE COURT: It's a voluntarily assumed obligation.
[7] MR. SALTZMAN: Correct.
[8] THE COURT: So how do you get Interstate's
[9] relationship with Chelsea and Interstate's separate
[10] relationship with the union into a position where they now have
[11] card check neutrality, card check neutrality is being imposed
[12] on Chelsea?
[13] MR. SALTZMAN: The simple answer is that Chelsea
[14] entered into a management agreement which made Interstate their
[15] agent without any express restriction on that point.
[16] THE COURT: That was effective as of 2001.
[17] MR. SALTZMAN: The management agreement with
[18] Interstate was effective, according to the document, as of
[19] February 2003, and at that point Interstate already had a 2001
[20] obligation.
[21] THE COURT: So Interstate's relationship burdened
[22] Chelsea as of February of 2003, you say, February 2004?
[23] MR. SALTZMAN: I wouldn't say burdened.
[24] THE COURT: Well, burdened, they were covered.
[25] MR. SALTZMAN: They were bound by that when they went

Page 42

[1] to Interstate and said, we really want you to be our managing
[2] agent, we need you, as they said, to enter the big time, top
[3] tier, the blue chips. The blue chips are organized. They have
[4] good wages and benefits for their employees.
[5] THE COURT: Then how do you explain for the next
[6] several years after that, February 2003, that is when they
[7] signed the contract, the hotel is not operating then, it
[8] doesn't begin to operate until December 2003, and then nothing
[9] happens for several years?
[10] MR. SALTZMAN: Not exactly nothing.
[11] THE COURT: What happens in the intervening time --
[12] let me phrase it more openly then -- what happens in the
[13] intervening time after the hotel opens up until the time of the
[14] arbitration?
[15] MR. SALTZMAN: Surely. What happens is that after the
[16] memorandum of agreement is signed, which is another document
[17] signed by Interstate providing for card check neutrality
[18] besides the 2001 agreement, they say the union sends a letter
[19] to Interstate saying, we now want to organize the Chelsea Grand
[20] Hotel. That is in like February 2004. We have produced a copy
[21] of an unsigned letter during discovery from Mr. Ward to
[22] Interstate, which is the first step in the organizing process,
[23] let the hotel know we are interested in organizing, we are
[24] going to be sending people over. Mr. Ward, I don't know if he
[25] said in his deposition or not, but whether or not that letter

Page 43

[1] was actually signed and sent, we don't have a signed version.
[2] The union clearly put Interstate on notice by other means,
[3] informally, I think he did testify actually on his deposition
[4] saying that I would call up Interstate and say here is what are
[5] going to do, send them a letter, give them a heads-up.
[6] MR. HAMILTON: Your Honor, I object. None of this is
[7] in the record that I am aware of.
[8] THE COURT: All right.
[9] MR. HAMILTON: If it is, I will stand corrected, but I
[10] don't recall it.
[11] MR. SALTZMAN: I think if you look at Mr. Ward's
[12] affidavit, you will see the reference to the fact that after
[13] the memorandum of agreement was signed in January 2004, the
[14] union contacted Interstate, said he was going to be organizing
[15] Chelsea Grand, and Interstate said, you know, can you hold off?
[16] We want to explain the situation to Chelsea. Now Chelsea says
[17] they didn't hear a word about it after that. We don't know and
[18] he can't say. We tend to think that Interstate might have sent
[19] something about it in next few years --
[20] THE COURT: Interstate hasn't been deposed at all?
[21] MR. SALTZMAN: Not yet.
[22] THE COURT: When are they scheduled to be deposed?
[23] MR. SALTZMAN: The next round of depositions, we don't
[24] have a date set.
[25] So at that point, the union said well, we have a

Page 44

[1] neutrality card check agreement with this hotel, and we will
[2] stand down and give you a chance to explain to them the
[3] situation, and there is the reliance, the segue right into that
[4] topic. There is the reliance and the benefit conferred to
[5] Chelsea because during that period of time, while the union
[6] thought it had a party bound by the neutrality card check, and
[7] it gives slack and room and that actually go in and organize at
[8] the beginning of the hotel when the workers not yet
[9] indoctrinated with the economic ability, the hotel has not yet
[10] been built up to withstand pressure, the union stands down and
[11] says, we will give Interstate time to talk to those folks.
[12] In that time, they benefit, the hotel benefits from
[13] substandard industry wages, substandard wages, practically no
[14] health benefits, together with retirement, those things are all
[15] used to the benefit of the hotel. The union gives up its
[16] strategic position, union gives up the dues, and those aspects
[17] of change or of reliance by the union are very similar to the
[18] ones that are cited by the court in the Property Advisory
[19] Group case.
[20] THE COURT: Did Mr. Ward or any of his officers or
[21] agents, organizing people, have any contact at all with the
[22] Chelsea Grand?
[23] MR. SALTZMAN: Directly probably not during the
[24] intervening period. I think the first one they had some
[25] meetings in 2007, but the reason I smile was that it was in Mr.

Page 45

[1] Lam's deposition, which we did not bring to the court's
[2] attention, particular provisions, but Mr. Lam recalled meeting
[3] Mr. Ward a few years before in late '97 and said that -- he
[4] testified that they met to discuss a labor agreement at that
[5] point, and that they couldn't reach agreement because Mr. Lam
[6] said, well, I will reach an agreement with you on running this
[7] hotel I want to buy, but I don't know how who run a restaurant,
[8] and there is this restaurant there so I want to contract out
[9] the restaurant, would you let me do that, and Mr. Ward said,
[10] no, I won't, and that ended the conversation.
[11]    THE COURT: That was in '97?
[12]    MR. SALTZMAN: Yes. So to the extent we know anything
[13] about this owner, we knew who the owner was, we would have
[14] known he was willing to enter an agreement and contract out.
[15] But the Interstate -- it's logical to assume Interstate did
[16] nothing in all those years. They said nothing and did nothing
[17] and didn't bring the agreement to the attention of Chelsea.
[18]    What's more, as a matter of law, an empty head and
[19] impure heart is not a defense to not knowing. They would -- I
[20] think the record is clear before you that Interstate told them,
[21] we have a contract with the union, we have relations with the
[22] union, and Chelsea did nothing in its due diligence to find out
[23] what they were. Instead, what they did was put Interstate in
[24] the position of being an agent, of being a manager, in an
[25] industry where managers bind the owners. By common sense

Page 46

[1] managers manage the hotels. What are they doing if they come
[2] in and say I am the manager?
[3]    THE COURT: What do you say about Chelsea's affiliate,
[4] Star?
[5]    MR. SALTZMAN: What about them?
[6]    THE COURT: The suggestion that Star took over the
[7] management of the employees or the employee relationship, and
[8] that Interstate was relegated to the role of just being a
[9] management consultant.
[10]    MR. SALTZMAN: We haven't heard from Interstate
[11] entirely, we haven't heard from Interstate in one respect. At
[12] the arbitration, they stipulated to the fact that they do
[13] direct and supervise employees and effectively recommend
[14] discipline. That is in the arbitration award, one of the
[15] exhibits to Mr. Maroko's affidavit. It's also in the
[16] deposition testimony of Mr. Luk where he indicated that the
[17] Interstate people will tell our workers, you are doing that
[18] wrong, you got to do this differently, and they certainly had
[19] better listen to Interstate because if I hear about it, they
[20] are going to get written up. They have hundreds of these
[21] writeups, and yes, they will get discharged. That was his
[22] deposition testimony, and it's not just on the stray issue, not
[23] like they will pick up the paper, this is -- what is Interstate
[24] on, by everybody's admission, what is Interstate management of,
[25] undisputed management of? The crown jewels, the Starwood flag.

Page 47

[1] That is the most important thing to Chelsea, that is why they
[2] hired Interstate, they wanted the Starwood flag, and the people
[3] who are managing the employees, the employees' reliance with
[4] the requirements of the Starwood flag, is undisputedly
[5] Interstate and certainly comports with their ability to be,
[6] manager, joint employer, and agent for this property.
[7]    THE COURT: You rely on 3.2 of the management
[8] agreement and 4.1 and 4.2. Those are cited in your brief.
[9]    MR. SALTZMAN: Yes.
[10]    THE COURT: Which specify what Interstate's management
[11] role was.
[12]    MR. SALTZMAN: Correct.
[13]    THE COURT: Regardless of what Star purported to do.
[14]    MR. SALTZMAN: Well, what we have at this point, we
[15] have those documents, those signed documents which have never
[16] been varied, never amended, never changed to comport with what
[17] they claim is reality. That I think has some weight. The
[18] question raised by Star, we don't know what Interstate would
[19] say here, but we do know that they certainly had some
[20] management ability. The question about Star is why, why this
[21] whole contraption, this Rube Goldberg arrangement to create a
[22] third-party manager which really isn't the third party at all
[23] by their own admission, to do something that they are paying 2
[24] percent of revenue to Interstate to do under their contract? I
[25] don't know the answer to that question. I really do want to

Page 48

[1] find out --
[2]    THE COURT: How about to underscore the point that
[3] they wanted to run a non-union shop, and they were concerned
[4] that by just letting Interstate manage and supervise employment
[5] and dismissing outside staff, as it says here in 3.2, that they
[6] might expose themselves to Interstate's contracts with the
[7] hotel workers.
[8]    MR. SALTZMAN: They certainly did that before when
[9] they signed the management agreement with Interstate back in
[10] February 2003, they didn't move anything over to Star, but
[11] even --
[12]    THE COURT: Your point here, Mr. Saltzman, is, having
[13] signed this contract some time in 2003, and then subsequently
[14] entered into a contract with Star, they never bothered to
[15] changing the Interstate contract?
[16]    MR. SALTZMAN: They never bothered changing the
[17] Interstate contract.
[18]    THE COURT: So the language you cite to me on page 4
[19] of your brief is the language that still obtains as between
[20] Chelsea and Interstate?
[21]    MR. SALTZMAN: As far as we could tell in the
[22] documents, yes, as far as we could tell, and there is this
[23] question of right of control, and it's a standard phrase in
[24] labor management and in individual employment contracts, the
[25] employer is the one with the right of control. Doesn't mean



Page 49

[1] that they necessarily exercise that control. They have the
[2] right of control, and they are the employer, they have that
[3] management duty.
[4]   It may be that Interstate said, well, we like getting
[5] our 2 percent in order to make sure this they can keep the
[6] Starwood flag, and we will -- you can let Star Perfect do
[7] whatever you want, we are happy with that, but we are going to
[8] maintain control over the employees for compliance. That may
[9] or may not be, but the contract that is binding between the
[10] parties now says that they, Interstate continues to have the
[11] right of control to do -- to act as a manager and as an agent
[12] for all matters that one would expect a property to do.
[13]   I am just going to move a little bit over to some of
[14] the -- if it's OK with the court -- having dealt with your
[15] question -- in terms of some of these agreements that they put
[16] up, there are two properties which we turned over documents to
[17] Chelsea which indicated that Interstate signed on behalf of
[18] itself at this hotel specifically limited to the hotel. Those
[19] agreements, those two properties, the Muse and the other
[20] Courtyard, those two agreements originated prior to 2001, prior
[21] to the applicable language. Look at the original exhibits in
[22] the first agreement, that is when it started, before 2001, and
[23] to the extent it carried over if at all, it carried over
[24] because they were grandfathered. That is the way it is.
[25]   What it does show, however, is even before the 2001

Page 50

[1] agreement, it corroborates the industry practice, because why
[2] do you have to say we are only signing for this hotel unless
[3] the assumption would be that we are signing for everybody?
[4] Which is exactly What happened in the memorandum of agreement.
[5] Mr. Ward didn't have to ask any more. Interstate comes in,
[6] they have a portfolio of hotels they manage, they have a couple
[7] that were carved out by as grandfathered in '98 or 2000.
[8]   MR. HAMILTON: Mr. Saltzman is testifying. There is
[9] no record that says What he is now saying. Again, I know you
[10] give both of us a lot of latitude, but I would just like to be
[11] sure we are kind of limited to the record before your Honor.
[12]   THE COURT: It seems familiar to me, Mr. Hamilton,
[13] based on my reading of his brief, and I read your reply, and it
[14] doesn't make that argument that you just raised now, but the
[15] facts are what the facts are, and I don't consider this a
[16] factual hearing. I consider this argument.
[17]   MR. SALTZMAN: The factual basis for my statements are
[18] in Mr. Ward's affidavit which lists several hotels, all the
[19] hotels that are bound in 2001 and 2006, includes the Roosevelt
[20] and the Park Central, both of which -- and in his affidavit he
[21] says they were bound by -- Interstate managed other hotels in
[22] the families in the 2001 agreement.
[23]   This is no more subject to challenge in any other
[24] affidavit evidence that we have before us. So when Mr. Ward
[25] meets with Interstate or his designee meets with Interstate to

Page 51

[1] negotiate the MOA in 2004 and Interstate says we have a
[2] portfolio, they are a well known player in the industry, they
[3] are a manager of a number of different hotels. Unless he's
[4] told otherwise, he assumes they meant they are binding the
[5] principal at each of these hotels, which is what the 2001
[6] agreement --
[7]   THE COURT: I don't want to anticipate What Mr.
[8] Hamilton is going to say, but how could they believe that when
[9] the Chelsea Grand organization said, as part of the negotiation
[10] with the Interstate folks, listen, we want to make one thing
[11] very clear, we don't want to have the union in here; and
[12] Interstate says OK, I understand. I am going to be -- they
[13] didn't say at the time, we have got to tell you something, we
[14] have already signed the industry-wide agreement, and if we are
[15] your manager, you are going to be hooked with the union.
[16]   MR. SALTZMAN: I am not sure that is entirely correct.
[17] I think they say, Mr. Luk's deposition testimony, that we have
[18] agreements with this union, and if they had done their due
[19] diligence, they would have known what those agreements were.
[20]   THE COURT: They are contracting parties, you know,
[21] and due-diligence, don't you think Interstate had an obligation
[22] to say, listen, you signed us up with this kind of management
[23] contract, this is What we are going to insist on, you have to
[24] understand that you are going to be roped into dealing with the
[25] union.

Page 52

[1]   MR. SALTZMAN: I am not sure that's right, because
[2] from Interstate's perspective, as from the union's perspective
[3] that is a given. Everybody -- anybody who is an operator,
[4] anybody who enters this industry --
[5]   THE COURT: That is my point. You say it's a given.
[6] Don't you think -- you say it's so obvious that they didn't
[7] have to disclose it?
[8]   MR. SALTZMAN: Correct, that's right, that when you
[9] enter this industry and you find out about what's going on, you
[10] know what the industry practice is. That is exactly What the
[11] court said in Property Advisory, that an owner in California,
[12] not New York, they couldn't go around the corner to the union's
[13] office and say can I have the 2001 agreement? If Interstate --
[14] What agreements did you sign, by the way, can we see them,
[15] instead of turning it loose, turning their agent loose into the
[16] industry to act in accordance with normal practices. In that
[17] case, that California company said, I don't know what's going
[18] on in New York, you can't bind me to the practice in New York.
[19] The court said, we certainly can.
[20]   THE COURT: You want take two more minutes, Mr.
[21] Saltzman?
[22]   MR. SALTZMAN: I will try to limit myself to a number
[23] of -- just a few comments here.
[24]   In terms of this cloud that the union is putting over
[25] their activities by virtue of demands for arbitration, the

Page 53

[1] demand for arbitration in the exhibits, we are not asking for
[2] anything draconian in that demand, and whether the arbitrator
[3] will grant even what we ask for, which is come up to industry
[4] standards for a brief time or implement the wages that you have
[5] been promising all along and been withholding, or just stop
[6] firing people who support the union or trying intimidate,
[7] threaten, and write them up, we don't know what the arbitrator
[8] will do. He may agree with us, he may not agree with us.
[9]     THE COURT: I think I asked this question last time:
[10] Why is this not -- if the conduct is as you suggest, why is
[11] this not a violation of the National Labor Relations Act?
[12]     MR. SALTZMAN: To some degree it is, and what happens
[13] in this case is, and it's cited in our brief in terms of
[14] discussion of the J.P. Morgan case and Verizon case, when there
[15] is a card check neutrality agreement in effect, then
[16] essentially the board stays away. The board says, whatever
[17] your agreement provides for, go take care of it, and we give up
[18] good consideration for that. We don't strike. We can strike
[19] but we don't strike, and we haven't. We have not interfered in
[20] the normal way that unions can with their operation. So under
[21] the J.P. Morgan line and the Verizon line of cases that are
[22] cited, the board says, you got an agreement, go follow it,
[23] whatever it says there, and this agreement says that in terms
[24] of both the organizing process and on the unfair labor
[25] practices, any failure to abide by that agreement would

Page 54

[1] certainly be intimidating, firing union supporters is inimical
[2] to the neutrality agreement. That goes to the arbitrator. So
[3] we are in that posture, and liking that posture.
[4]     The court had raised the question, why didn't Chelsea
[5] move to stay, and I think Mr. Hamilton may have misspoken.
[6] It's the first arbitration and notice was provided to
[7] Interstate and not in Chelsea individually, because if
[8] Interstate is their manager, their agent, and their joint
[9] employer, that we presume Interstate gave them some heads-up on
[10] what's happening, but we don't know.
[11]     the Second notice of arbitration that was sent, and
[12] it's an exhibit to Mr. Maroko's affidavit, clearly indicates
[13] that notice was sent to Mr. Hung Luk at the hotel's address.
[14] They also had a former address, 54 Canal Street, which was the
[15] address that was on their management agreement, but it was
[16] certainly sent to the hotel addressed to Mr. Luk.
[17]     So they knew that the union was arbitrating back in
[18] February. They also knew that there was going to be a card
[19] count. They provided the office of the impartial chairman with
[20] the forms that they had previously refused to provide under
[21] cover letter from Interstate on Chelsea Hotel stationery. The
[22] stationery is an exhibit to Mr. Maroko's affidavit, it is
[23] exactly the same stationery that Mr. Luk uses in one exhibit
[24] thereafter. It's at the very end of Mr. Maroko's affidavit.
[25]     THE COURT: 13 and 14 of Mr. Maroko's affidavit. Where

Page 55

[1] is the letter?
[2]     MR. SALTZMAN: Mr. Maroko's affidavit, Exhibit 9, is
[3] the cover letter from Jeffrey Trumpler, assistant general
[4] manager of the Four Points By Sheraton, and it's on stationery
[5] Four Points By Sheraton Manhattan Chelsea, addressed to the
[6] impartial chairman. It says here is the W-4s, but the card
[7] count and it's dated February 22, 2007. It's Exhibit 9.
[8]     THE COURT: When you print these out the ECF, it
[9] doesn't come out the same.
[10]     MR. SALTZMAN: Yes, and I am a fan the old method.
[11]     THE COURT: Yes.
[12]     MR. SALTZMAN: If you look a little bit further back,
[13] you see after Exhibit 9, Exhibit 11 is a letter from Mr. Luk to
[14] Mr. Ward written on exactly the same stationery.
[15]     THE COURT: Yes.
[16]     MR. SALTZMAN: You would think that if Interstate is
[17] running amok at this point, they are doing something about it,
[18] but they don't. They allow Interstate to provide W-4s which
[19] Interstate said at the hearings several times, we are providing
[20] these because we got them from Chelsea, Chelsea let us have
[21] them. And even before that, they provided access to a hotel
[22] property. We can't just walk in and start talking to employees
[23] all the time, and we were allowed that access. They gave us a
[24] list of the names and identifying data for the employees so we
[25] knew who to talk to. They gave us that. Interstate said at

Page 56

[1] hearings with the arbitrator, we got this from Chelsea, Chelsea
[2] is allowing us to go forward, and so it's disingenuous to say,
[3] well, we didn't know what was going on and we would have moved
[4] if only we knew.
[5]     The card count was March 6, I believe. They had
[6] plenty of time -- or March 16 -- I may have mistaken the date
[7] tell you in a moment -- March 6. So they had plenty of time
[8] from the time that they started receiving notices, that they
[9] started getting arbitration awards at the end of January or
[10] early February and mid-February, and then after they handed
[11] over the W-4s, if they had a change of heart they could have
[12] run in and said, oh, my gosh, we made a mistake, we never have
[13] done this, we want to enjoin the card count.
[14]     But now, as your Honor put it, the deed is done. The
[15] employees have signified what they want, who they want to be
[16] represented by. All we are asking is to be allowed to
[17] represent these workers in discussions with Interstate -- with
[18] Chelsea, that is all, and have a voice for those workers where
[19] we feel that they are acting improperly in the arbitration.
[20]     THE COURT: Your point, Mr. Saltzman, with respect to
[21] this request for an injunction is it's premature, there is no
[22] irreparable harm here, arbitration doesn't hurt anything?
[23]     MR. SALTZMAN: No.
[24]     THE COURT: And there is no likelihood of imminent
[25] damage at this particular stage?

Page 57

[1]  MR. SALTZMAN: None.
[2]  THE COURT: As to Mr. Hamilton's point about he never
[3]  authorized Interstate to engage in this conduct on behalf of
[4]  Chelsea, you are saying, well, the facts just aren't in on
[5]  this, we don't have all the facts. That may be a fair
[6]  determination, but we don't have the basis for making any such
[7]  determination right now.
[8]  MR. SALTZMAN: That is certainly the minimal argument.
[9]  The argument the union is making in addition to that is that
[10] the facts that we do have clearly indicate that they authorized
[11] Interstate.
[12] THE COURT: Nobody can say that until you depose
[13] Interstate, I suppose.
[14] MR. SALTZMAN: I suppose Interstate can come in and
[15] say we reached our agreement, we really betrayed our trust.
[16] THE COURT: You certainly want to hear from them.
[17] MR. SALTZMAN: That would be the ultimate question in
[18] the case, and that is why a preliminary injunction would
[19] certainly be premature.
[20] THE COURT: All right. Mr. Hamilton, I will give you
[21] the last word here.
[22] (Pause)
[23] THE COURT: All right, Mr. Hamilton.
[24] MR. HAMILTON: Thank you, your Honor. I would like to
[25] start backwards. I will take the union's point, no imminent

Page 58

[1]  danger. Here is what the union went to the IC with on July 12,
[2]  2007: What shall be the remedy against the joint employer
[3]  jointly and severally for any violations that are found
[4]  including without limited to back pay, injunctive relief,
[5]  actual damages, punitive damages, fees and costs, statutory
[6]  remedies, and the dollar amounts thereof. That is the
[7]  suggested remedy.
[8]  THE COURT: Even if they got that remedy, you wouldn't
[9]  have to pay it, you could refuse to pay it, you could refuse to
[10] be bound by it, and you would have an opportunity to go to
[11] court and say, this is a manifest injustice because we are he
[12] were never signatories to the contract.
[13] MR. HAMILTON: But, your Honor, if we do that, if we
[14] had to do that, if we had to do that, your Honor, the die is
[15] already cast. The $35,000 a day, that is the history here,
[16] that is the history. We are dead meat. How fast can come
[17] into --
[18] THE COURT: $35,000 is running right now, as I
[19] understand it.
[20] MR. HAMILTON: No, it isn't.
[21] MR. SALTZMAN: No.
[22] MR. HAMILTON: We complied. Six days after the card
[23] count order was made, we complied. After the penalty was
[24] imposed, my client complied. By the way, that is another
[25] point. I don't know what Mr. Saltzman calls waiver. The

Page 59

[1]  waiver is a voluntary relinquishment of a known right. The
[2]  word is "voluntary". If I got a $35,000 a day gun to my head,
[3]  takes all of my revenues, I am not acting voluntarily when I
[4]  permit the union to have access to my property under an order
[5]  of an IC that says, if you don't give them access, it will be
[6]  $35,000 a day. So that is not a waiver, it's not evidence that
[7]  we have accepted any of the IC's or the union's requirements
[8]  except we don't want to be hit for another $35,000 a day.
[9]  The point I want to make, another point I want to make
[10] here, Mr. Saltzman said, your Honor, we don't know whether we
[11] are going to ask for these penalties, we don't know --
[12] THE COURT: I think he said we don't know whether we
[13] are going to get them.
[14] MR. HAMILTON: What is important here is -- I am going
[15] to take something out of Mr. Maroko's affidavit to this court.
[16] It's paragraph 26, and your Honor, I would like to compare what
[17] he says under oath with what the union asks for. His affidavit
[18] is around the same time. I will read it, paragraph 26:
[19] "The union demand does not request the sort of
[20] punitive damages awarded in the February 16 award because the
[21] union believes the relief request will be adequate. The union
[22] regards the February 16 award of punitive damages as
[23] appropriately made in the extraordinary circumstances,
[24] situations that day blatantly failed the promises made to the
[25] union and IC Drogan just days earlier, in a cynical attempt to

Page 60

[1]  withhold basic employee documents in order to prevent
[2]  confirmation of employee choice. Such a remedy is not
[3]  appropriate for every violation of 10(b)(4), the idea being has
[4]  not been rendered in any other organizing context as now
[5]  requested by the union.'
[6]  This remedy is precisely in the words what the union
[7]  requested before when --
[8]  THE COURT: Why wouldn't you tell the arbitrator this?
[9]  This is off the table now in light of the representation that
[10] Mr. Maroko made in a sworn affidavit submitted to a district
[11] court judge. What impact that has on the impartial chairman.
[12] MR. HAMILTON: This is of no concern to the general
[13] counsel, and the union under oath said this and asked for that,
[14] and now we have to take --
[15] THE COURT: It's probably -- really, it's just
[16] boilerplate. I would take this to the arbitrator and say, you
[17] know, punitive damages is off the table.
[18] MR. SALTZMAN: Just to protect the record, the exhibit
[19] that Mr. Maroko is referring to, the demand for arbitration
[20] dated July 12 for the hearing that is now scheduled to
[21] September 25.
[22] THE COURT: That precedes Mr. Maroko's affidavit by a
[23] month.
[24] MR. SALTZMAN: He was referring to the relief that we
[25] are asking for there, which does say punitive damages, but it's

Page 61

[1] very specific as to the kind of relief that we are asking, and
[2] the punitive damage reference there in the demand for
[3] arbitration is, you know, unilaterally —
[4]     THE COURT: He says it's more limited, and beside his
[5] affidavit is subsequent to this, so my reaction would be, take
[6] it up with the arbitrator.
[7]     MR. HAMILTON: Your Honor, one other thing that I
[8] thought was important: Your Honor commented on how can we be
[9] bound to an agreement, the MOA, which was executed after the
[10] management agreement was signed, and executed 11 months after
[11] but made retroactive to a time period two and a half years
[12] before the management agreement was signed.
[13]    THE COURT: Mr. Saltzman also says that Interstate was
[14] a signatory to the 2001 industry-wide agreement.
[15]    MR. HAMILTON: But here is the —
[16]    THE COURT: I asked him this question, and really, you
[17] know, the die was cast as of the time in February of 2003 when
[18] your client, Chelsea, gave Interstate the opportunity to manage
[19] the hotel on your behalf, and the union contract, the
[20] industry-wide agreement, says there anybody who has management
[21] responsibility, has a right to hire and fire, is bound to the
[22] agreement.
[23]    MR. HAMILTON: But, your Honor, there is no reliance
[24] on that. Look at what Mr. Ward said. This is his testimony.
[25] Reliance is an element of apparent authority, has to be there.

Page 62

[1] That is a required legal element. Here is the question that
[2] says:
[3] Q. Do you find that most management companies such as
[4] Interstate have some limit to their authority to run or operate
[5] the hotel?
[6] "A. I am sure there are limits to everyone's authority.
[7] "Q You didn't know any of the specifics of what they,
[8] Interstate, did?
[9] "A No I don't know the exact specific details of the
[10] management responsibilities."
[11]    How is it there could be reasonable reliance on an
[12] agreement he never saw, the management agreement? How could
[13] there be? And he never — he knew there were limits on their
[14] authority, and he never asked what they were. How could that
[15] be, your Honor? You see, that is the threshold that we are
[16] dealing with here.
[17]    THE COURT: I suppose if we had a hearing here, Mr.
[18] Ward would tell me that his understanding was that Interstate
[19] was a signatory to the industry-wide agreement, and as a
[20] signatory to the industry-wide agreement that he believes
[21] reasonably that it bound the hotels in which it had the
[22] management contract. It didn't have to go much beyond that.
[23]    MR. HAMILTON: I don't believe the industry-wide
[24] agreement itself bind the hotels that are managed. I believe,
[25] as I pointed out to you earlier, that requires the signature of

Page 63

[1] the hotel.
[2]    THE COURT: Mr. Saltzman disagrees with you. I am
[3] sitting here, and that is a fact that has to be decided, but
[4] you have to give me clear and convincing evidence that you are
[5] going to be irreparably harmed, and the record here is really
[6] not very firm, I don't want to call it inchoate, but it's not
[7] clear and convincing, I can tell you that.
[8]    MR. HAMILTON: Your Honor, my understanding is
[9] preponderance, not clear and convincing on irreparable harm.
[10] That would be a different — I am not quibbling, I am just
[11] saying my understanding.
[12]    I want to make a point on this retroactivity. The
[13] case of Thomas CSF v. American Arbitration Association, Second
[14] Circuit 1995, here is what they say about attempting to infuse
[15] into, if you will, a party a situation just like this. They
[16] say because a working agreement was entered into well before
[17] Thompson purchased Reinfusion, Thompson could not possibly be
[18] bound under an agency theory.
[19]    Again, that is what we are dealing with here. We
[20] can't be bound under an agency theory when in fact the person
[21] who says he relied on apparent authority did not know, did not
[22] find out, did not inquire about, did not understand, what the
[23] limits or what the obligations of Interstate were.
[24]    THE COURT: But if I grant the injunction you are
[25] seeking here, what does that do to the arbitration?

Page 64

[1]    MR. HAMILTON: Here is the thing, your Honor: If you
[2] grant the injunction we are seeking, what it does is it keeps
[3] us in the present status quo. What it doesn't permit the union
[4] to do is go, run in one more time, in whatever way they go in,
[5] and ask for this or any part of this.
[6]    THE COURT: It would stop the arbitration.
[7]    MR. HAMILTON: It would stop the arbitrator from
[8] making another decision tht stems from an agreement which we
[9] didn't sign. It would stop that arbitrator —
[10]   THE COURT: Don't you have the cart before the horse
[11] here? Isn't your remedy to let the arbitrator do what he does
[12] and then challenge the result? As a matter of fact, that is
[13] what you are doing, and that actually removes from state court
[14] to federal court, and then we got the burden of this excursion
[15] about giving you some relief from the — in our first
[16] conference of June 27 and then the request for an injunction
[17] that I suggested you make.
[18]    It seems to me now, Mr. Hamilton, with all due
[19] respect, that this whole matter is premature in that I don't
[20] have enough of a record here to support your point. You don't
[21] have enough of a record here to support your point either. You
[22] haven't even deposed or taken any real discovery of Interstate,
[23] so what you are asking for is the ultimate relief that you may
[24] very well be entitled to, I have a very open mind on that,
[25] because the issue that you raise is a significant one, but I

Page 65

[1] don't see how it's -- I think the standard as clear and
[2] convincing, but if it's not clear and convincing it's
[3] preponderance of the evidence. I don't think the preponderance
[4] of evidence works in your favor in this particular instance.
[5]     MR. HAMILTON: May I ask this, your Honor.
[6]     THE COURT: Yes.
[7]     MR. HAMILTON: As to the going back to the arbitrator,
[8] what do we do about being able to speak our mind to the
[9] employees, long-time employees of the hotel? What do we do in
[10] face of an arbitrator who has found we acted in bad faith, an
[11] arbitrator who has determined that the neutrality provisions of
[12] the agreement require us to remain muzzled, an arbitrator who
[13] has enforced, set and enforced a penalty that may not be
[14] reviewable by a court.
[15]     THE COURT: I am sorry, Mr. Hamilton, but I don't give
[16] advisory opinions, and you are a skilled advocate and well
[17] experienced, so I think you can answer your own question. Your
[18] position is that you are not bound by this contract.
[19]     MR. HAMILTON: That is true.
[20]     THE COURT: So if you are not bound by the contract,
[21] then I suppose you can figure out what you are free to do. I
[22] can't sit here now and say it's OK to do whatever you want, and
[23] please don't say that I said that.
[24]     MR. HAMILTON: I wouldn't say that, your Honor. You
[25] haven't determined the merits of this cause yet, but the

Page 66

[1] injunction is to enable us to be on an even playing field, your
[2] Honor. It's to enable us to operate our business.
[3]     THE COURT: You have an issue before the arbitrator
[4] though. You say you are not signatory to the contract. I
[5] mean, you can figure it out from there.
[6]     MR. HAMILTON: Do we go to the arbitrator and say we
[7] know we are here now. Is the union going to say, you just
[8] admitted the arbitrator's jurisdiction?
[9]     THE COURT: I don't know. I can't advise you on that.
[10]     MR. HAMILTON: They will say that. You have heard the
[11] arguments with a force of the gun, $35,000 gun to our head.
[12] You have heard that they claim that we waived our right to
[13] assert that the union shouldn't be in there so --
[14]     THE COURT: I understand all of that, and I really
[15] think that your initial action in State Supreme Court which was
[16] removed to Federal court, and then Mr. Brody conceded there was
[17] federal jurisdiction is still the way to go, but not by the
[18] route of -- having thought about now and read your papers and
[19] considered your arguments, I don't think that there is a
[20] showing here, an adequate showing of irreparable harm,
[21] certainly not from the arbitration. Any damages that you might
[22] experience are strictly speculative, and the loss of the flag
[23] from the Sheraton Four Points is not imminent. I suggest you
[24] finish up your discovery and then bring on by motion -- I will
[25] make time on my calendar -- to set aside the arbitrator's

Page 67

[1] decision on a full record here so I can know whether or not the
[2] arbitrator was or was not correct, whether or not you were
[3] bound by the contract, because of your agent, Interstate, and
[4] we will make that determination on a full record, but at this
[5] particular stage, Mr. Hamilton, I am afraid I am going to have
[6] to deny your injunction for the reasons I have given.
[7]     MR. HAMILTON: Is your Honor suggesting we could have
[8] a earlier trial?
[9]     THE COURT: Yes, you work that out with Mr. Saltzman.
[10] I will give you an early trial date.
[11]     MR. HAMILTON: As soon as we take the Interstate
[12] discovery and your Honor is available?
[13]     THE COURT: I have an open trial calendar.
[14]     MR. HAMILTON: That sounds good.
[15]     THE COURT: Those are your choices, Mr. Hamilton.
[16]     MR. HAMILTON: I think we will then be proceeding to a
[17] early trial.
[18]     THE COURT: All right, fine. It Suits me. I am sure
[19] it suits Mr. Saltzman. Am I speaking for you, Mr. Saltzman?
[20]     MR. SALTZMAN: Mr. Brody and I have discussed
[21] continuing discovery. We are facing beyond the discovery
[22] period. We were hoping to put together a joint submission of
[23] dates. I think we worked out the dates primarily, but we
[24] didn't have a chance to get it done given the flurry of --
[25]     THE COURT: There is a series of letters here about

Page 68

[1] discovery disputes. Do you want to take those up now, or do
[2] you want to meet and confer, and then we will have another
[3] session shortly about discovery matters?
[4]     MR. SALTZMAN: On a different day or today?
[5]     THE COURT: We can do it now. It's the end of a long
[6] day. You can meet and confer and see what your real disputes
[7] are in light of an imminent trial.
[8]     MR. SALTZMAN: We have met and conferred, but I think
[9] that given this current motion and the court's decision on the
[10] motion, I for one would welcome the opportunity to speak to
[11] Mr. Brody about it, and if we have to trouble you with
[12] discovery, I think we will in fact have to come back.
[13]     MR. BRODY: Your Honor, if I may --
[14]     THE COURT: Yes.
[15]     MR. BRODY: We discussed this --
[16]     THE COURT: Excuse me, Mr. Brody. We won't bother
[17] with a pre-motion conference. Just submit your letters about
[18] what your disputes are, and we will rule on them right away.
[19] We don't go through a two-step process.
[20]     MR. BRODY: Are you suggesting the letters we
[21] submitted, you would like us to resubmit them? I am not sure I
[22] follow you.
[23]     THE COURT: I think you ought to meet and confer. If
[24] those are still the disputes that you have, let me know that.
[25] If you can make modifications, then submit new letters, but the

[1] letters will be letter briefs, and normally I require a
[2] pre-motion conference. I won't do that here. We will go right
[3] into the discovery disputes.
[4]    MR. SALTZMAN: From the union's position, the letter
[5] that we just submitted to the court regarding discovery
[6] disputes is subject to, it requests the opportunity for a
[7] conference.
[8]    THE COURT: You may want to at that point, Mr. Brody.
[9]    MR. BRODY: Yes, your Honor.
[10]    MR. SALTZMAN: Thank you, your Honor.
[11]    THE COURT: Thank you very much.
[12]                -o-